No. 74,766

SAUNDRA F. DEPEW, *Claimant/Appellant*, v. NCR ENGINEERING & MANUFACTURING, *Respondent/Appellee*, AMERICAN GUARANTY & LIABILITY INSURANCE COMPANY, *Insurance Carrier/Appellee*, LIBERTY MUTUAL INSURANCE COMPANY, *Insurance Carrier/Appellee*, and KANSAS WORKERS COMPENSATION FUND, *Appellee*.

(947 P.2d 1)

Opinion filed October 31, 1997.

*Norman I. Cooley*, of Wichita, argued the cause and was on the briefs for appellant.

*Douglas D. Johnson*, of Johnson & Kennedy, of Wichita, argued the cause and was on the briefs for appellees NCR Engineering & Manufacturing and Liberty Mutual Insurance Company.

*Vincent L. Bogart*, of Klenda, Mitchell, Austerman & Zuercher, L.L.C., of Wichita, argued the cause and was on the briefs for appellee Kansas Workers Compensation Fund.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Saundra Depew, whose work activities all involved use of a computer, sought compensation for bilateral carpal tunnel syndrome. The administrative law judge (ALJ) determined that Depew should be compensated for a permanent partial general disability. On review, the Workers Compensation Board (Board) concluded that she had suffered two separate scheduled injuries to her forearms. Depew appealed the Board's decision to the Court of Appeals, which affirmed the Board's decision. *Depew v. NCR Engineering & Mfg.*, 23 Kan. App. 2d 463, 932 P.2d 461 (1997). Depew's petition for review was granted by this court.

Depew raised two issues on appeal: (1) In the circumstances of this case, should the claimant have been compensated for a permanent partial general disability or for two separate scheduled injuries? and (2) Does the Board's decision awarding compensation for two separate scheduled injuries violate the Equal Protection Clause of the federal Constitution?

Depew began working at NCR in September 1978. By 1980 she was using a computer in her work. She was the first secretary at NCR to use a computer. In February 1989, she began working in a department where all activities, including ordering supplies, filling out time sheets, completing expense statements, and reading mail, were computerized. At that time she also began using a computer mouse for producing detailed computer drawings of product systems. She estimated the portion of her work time spent in making drawings as approximately 1 day a week. She used the keyboard of the computer to perform her other job tasks.

Before Thanksgiving 1990, Depew began to have "a shooting, aching pain" that ran from the palm of her right hand up into her forearm. The symptoms increased with time. She was referred to an orthopedic surgeon, Dr. Melhorn, who performed surgery on her right wrist and elbow on April 1, 1991. The surgeon's operative report states that the procedure decompressed the right median

nerve that was entrapped at the wrist and the right ulnar nerve that was entrapped at the elbow. She returned to work on May 6, 1991, with no restrictions on her activities. When she returned to work, Depew's right hand and arm were not hurting or bothering her at all. She believed that the problem "was fixed." Within a few weeks of returning to work and resuming her regular work activities, however, her hand and arm began hurting again.

On May 17 she telephoned her surgeon's office reporting that her right hand and arm ached and were sore. She told him that "she types and uses the mouse all day long." On May 21, Depew had an appointment with Dr. Melhorn. His notes from that visit include the following:

"I shared with her that this is consistent with the entrapment post release process. Some permanent damage had occurred to the nerve prior to the surgical release. The goal of surgery is to decompress but not to return to normal.

. . . .

"I shared with her that over the next 18 months gradual improvement will occur, although again complete resolution is unlikely."

On May 24, Depew told Dr. Melhorn that she still has some ache and a sharp shooting pain up her arm. On May 31, she felt that she had "made gains."

On August 8, Depew told Dr. Melhorn that she was frustrated because she "continued to have symptom complaints [discomfort involving her right arm] off and on." Since she had last seen Dr. Melhorn, her family physician had sent her to Dr. Artz, who injected her right wrist. Because there was no improvement, he and the family physician agreed that "she probably has a recurrence of the nerve entrapment process due to scarring at the wrist and elbow." Dr. Melhorn's notes from four more office visits during August indicate no marked change.

On September 9, Dr. Melhorn noted: "She indicates that the right arm is still the area that tends to bother her the most, although she does on occasions continue to have symptoms with regard to the left." On September 13, Dr. Melhorn wrote: "Her latency on the left has now moved into the range of a probable mild bilateral [carpal tunnel syndrome]." With regard to the discomfort in her right arm and hand, Dr. Melhorn stated his opinion that "the sur-

gical procedure provided was appropriate. I'm not convinced at this time that there is any scar formation in the palm area. I believe it has to do with her work activities." For the first time, Dr. Melhorn's notes reflect consideration of placing restrictions on Depew's work. He recommended that she modify her work program to "4 hours per day regular and 4 hours per day of non-typing/non-key entry/non repetitive pattern." He wrote:

"[A]t her present workload pattern, I believe that she may end up developing a CTS on the left that would require surgical intervention.

"Based on the above, our plan today will be to provide her this modified work program, have her follow Tuesday and check response with regard to her and her employer and availability of work pattern.

"Based on symptoms on the left, additional treatment options may be required."

When Depew returned on September 17, she told Dr. Melhorn that her wrists and elbows, both right and left, ached. With regard to her modified work program of 4 hours of regular work alternating with 4 hours without typing, key entry, or repetitive motions, Dr. Melhorn wrote: "[S]he just can't sit at work and not work and so even though her employer tried to accommodate, she basically worked a regular eight hour plus day." In order to decrease the risk of further deterioration of the condition of her left hand and arm, Dr. Melhorn further modified her work program. She was to be limited to 6 hours of work a day with alternating 2-hour blocks of regular work activities, "which may include typing," with 2-hour blocks of "regular work non-typing." On October 18, Depew reported to Dr. Melhorn that her right hand and arm remained symptomatic and that the symptoms in her left hand and arm were gradually increasing.

In mid-December, Depew was sent by her employer to Dr. Lucas, another orthopedic surgeon. He agreed with Dr. Melhorn that her condition would not improve if she continued performing her work activities, and she was advised not to return to work. It is agreed that her last day of work for NCR was December 16, 1991.

Dr. Lucas testified that he understood that Depew's work activities consisted of secretarial work and "computer sorts of things." In his opinion, the condition of her hands and arms was related to her work activity. With respect to her right hand and arm, Dr.

Lucas stated on direct examination "that her return to work probably didn't cause her to have more symptoms." On cross-examination, however, he agreed that "the problem in the right had never gone away and it was just sort of a flare-up of symptoms of the same situation." He thought that she had returned to work "quite early following her surgery and so she probably had never gotten over it in the first place." He viewed the conditions in her left and right extremities to be separate conditions, both causally related to the type of work she performed. He also believed that she may have had some predisposition to develop her conditions and that she probably would not have developed the "problems" on her left side if she had not favored the right by reducing its activity and thereby subjecting the left to an increase in work activities. Although he agreed that "if it hadn't been for the problems on the right side, the problems on the left probably wouldn't have occurred," Dr. Lucas also agreed that "unless and except for th[e] type of work, these symptoms would not have developed in the left hand."

Dr. Jones, an orthopedic surgeon who specialized in hand surgery, examined Depew in July 1992. He understood that Depew's work activities at NCR consisted of "keyboard all day long." In his opinion, the condition of Depew's right hand and arm is "related to 13 years of computer entry." Asked if he thought that the condition of her right extremity contributed to the development of her left upper extremity condition, Dr. Jones testified:

"A. Usually what we see, *if they got a bilateral* they get one done, as soon as one is done and then the opposite one starts giving them more problems.

"Q. So is there a causal relationship, in your opinion, between the right carpal tunnel and the developing of symptoms with respect to the right [*sic*] carpal tunnel?

"A. The right one's bound up for six weeks and they overuse it and probably *get symptoms* because of that.

"Q. When you say overuse it, you're mentioning the left hand?

"A. That's correct." (Emphasis added.)

Dr. Jones also testified that Depew had used both hands in operating her computer keyboard, that she "should have" had some permanent impairment of her right hand at the time she returned

to work after surgery, and that "going back to work aggravated that."

The ALJ stated that the parties stipulated to all necessary elements of the claim, including wages, benefits, and medical expenses, and that Depew's injury arose by accident out of and in the course of employment. The work activity responsible for the injury was not specified. The ALJ determined that Depew had a "permanent partial general body work disability." On review, the Board adopted the stipulations stated by the ALJ. The work activity responsible for the injury was not specified. The Board determined that "claimant has not established a simultaneous injury but has, instead, established two separate [scheduled] injuries." The Court of Appeals affirmed the decision of the Board.

We first consider whether the claimant should have been compensated for a permanent partial general disability or for two separate scheduled injuries. The current state of the law with regard to workers' injuries to both right and left upper extremities is succinctly stated in the Court of Appeals' opinion:

"Scheduled injuries are set forth in K.S.A. 44-510d. In particular, 44-510d(13) provides that compensation for loss of an arm shall not exceed 210 weeks. Where specified combination injuries occur, 44-510c(a)(2) requires that they be treated as a permanent total disability rather than as scheduled injuries. K.S.A. 44-510c(a)(2) has been extended by case law to allow compensation for certain combination injuries based on permanent partial disability. See *Hardman v. City of Iola*, 219 Kan. 840, 844, 549 P.2d 1013 (1976). In *Murphy v. IBP, Inc.*, 240 Kan. 141, 144, 727 P.2d 468 (1986), the Supreme Court held that simultaneous aggravation to both arms and hands through repetitive use removes the disability from a scheduled injury and converts it to a general disability." 23 Kan. App. 2d at 465-66.

The Court of Appeals first dealt with Depew's contention that she should have been compensated for a general bodily disability rather than two separate scheduled injuries under the holding in *Berry v. Boeing Military Airplanes*, 20 Kan. App. 2d 220, 885 P.2d 1261 (1994). The Court of Appeals concluded that *Berry*

"addressed a question totally separate from the one presented here. *Berry* established a method for determining the date of accident for a worker with carpal tunnel syndrome. *Berry* did not involve the question whether compensation for

carpal tunnel syndrome should be based on a scheduled injury or on a general disability." 23 Kan. App. 2d at 466.

In this court, Depew takes exception to the Court of Appeals' view of *Berry*. She contends that *Berry* "addressed directly and explicitly the exact issue in the case at bar." She directs the court's attention to the following portion of the opinion:

"Our analysis to this point has demonstrated the complexities in fixing the 'date of injury' or 'date of occurrence' in a carpal tunnel syndrome case. We hold that the claimant's date of injury as to his left wrist and as to his bilateral carpal tunnel condition will be the same—the last day he worked for respondent. This offers simplicity and establishes uniformity in the process in dealing with carpal tunnel syndrome cases. It also eliminates the problem of sorting out a scheduled injury from an injury which has caused permanent partial general disability. Since the disability is to be computed from the last day of work, we have one injury, that being a bilateral carpal tunnel injury, and only one injury on which to determine claimant's disability." *Berry*, 20 Kan. App. 2d at 227.

In *Berry*, a disability benefit claim was filed by Berry for problems with his left fingers and hand in May 1987. The next month, an orthopedic surgeon diagnosed Berry as having carpal tunnel syndrome in his left wrist. Berry was fired when he refused a position that accommodated his condition. His last day of work was August 27, 1987. After he no longer worked at Boeing, Berry had surgery on his left wrist. That is when he developed symptoms in his right hand.

The ALJ found that the date of Berry's bilateral carpal tunnel syndrome was his last day of work at Boeing, August 27, 1987. On review, the Workers Compensation Board agreed that the date of Berry's "accident" was his last day of work and found the injury to be a permanent partial general disability. In the Court of Appeals, Berry contested the Board's determination of the date of injury and the extent of disability. There was no cross-appeal from the determination that the injury was a permanent partial general disability rather than a scheduled injury. With regard to the date of injury, Berry argued that it was earlier than July 1987, when certain material changes in the law became effective. 20 Kan. App. 2d at 222.

Depew contends that *Berry* must be read to permit treatment of bilateral carpal tunnel syndrome as a general body disability irrespective of simultaneous aggravation. In other words, she argues that *Berry* dictates that result in the present case even given the Court of Appeals' finding that the aggravation of her forearms was not simultaneous. The Court of Appeals stated with regard to the scope of *Berry*:

"[I]n *Berry* the court simply inferred that the worker suffered a simultaneous aggravation based on the fact that the Board applied the permanent partial general disability statute. 20 Kan. App. 2d at 227. *Berry* only mentions 44-501d and *Murphy* in passing. *Berry* certainly does not purport to modify the simultaneous aggravation rule adopted in *Murphy*.

"In short, *Berry* defines the date of injury for a worker who suffers carpal tunnel syndrome. Although there is some dicta in *Berry* which might suggest otherwise, 20 Kan. App. 2d at 227, we do not read *Berry* as an attempt to overturn *Murphy* by implication." 23 Kan. App. 2d at 466-67.

This reasoning is sound. Although *Berry* demonstrates the difficulty in applying workers compensation statutes to bilateral carpal tunnel syndrome injuries, it does not conflict with our holding in *Murphy v. IBP, Inc.*, 240 Kan. 141, 727 P.2d 468 (1986). We agree with the Court of Appeals that Depew's reliance on *Berry* is misplaced.

We next consider Depew's argument that by affirming the Board's decision, the Court of Appeals "violated" our decision in *Murphy*. The Court of Appeals distinguished *Murphy* from the present case on the following ground:

"Unlike *Murphy* and many of the bilateral carpal tunnel cases which arise in the meat packing industry, this case involves work that Depew performed with one hand. She used the right hand to grip her computer mouse, and she developed carpal tunnel symptoms in her right hand. After she had surgery on her right hand, she switched to her left hand to grip the mouse. After she began to use her left hand to grip the mouse, she developed carpal tunnel symptoms in her left hand." 23 Kan. App. 2d at 468.

The premise upon which the Court of Appeals finds *Murphy* distinguishable from the present case is faulty. This is not a case involving work performed with one hand. The Court of Appeals' focus on Depew's one-handed use of the computer mouse, to the exclusion of her two-handed use of the computer keyboard, as the

cause of her condition is not supported by the medical evidence. None of the medical testimony would support a finding that her use of the mouse could be singled out as the cause of her condition. Dr. Jones testified that he understood that Depew's work activities at NCR consisted of "keyboard all day long." In his opinion the condition of Depew's right hand and arm is "related to 13 years of computer entry." Dr. Lucas testified that he understood that Depew's work activities consisted of secretarial work and "computer sorts of things." In his opinion, the condition of her hands and arms was related to her work activity. Unlike the testimony of the other two doctors who had examined Depew, Dr. Melhorn's notes do contain a few references to her use of a computer mouse, not solely but always in conjunction with other activities. Review of Dr. Melhorn's notes of 25 office visits and several telephone calls during 1991 reveals the following references to use of a mouse, none of which could be characterized as his attributing Depew's condition to it:

1. March 18—"Work History: . . . Patient performs secretarial duties and uses a mouse a lot."
2. May 17—"She states she types and uses the mouse all day long."
3. May 21—"She has been doing the mouse work activities, etc."

More relevant with respect to causation is that Dr. Melhorn never restricted her use of a mouse. Instead, he took note of the long hours she worked and restricted the number of consecutive and total hours she could do keyboard work in a workday:

1. September 9—"She indicates that today, for example, she's been up and typing since 5:45 a.m."
2. September 13—"I feel it would be in her best interests from a medical point of view to be on a work level of 4 hours per day regular and 4 hours per day of non-typing/non-key entry/non repetitive pattern."
3. September 17—"[A]dditional work guides will be provided. This will be two hours of regular type work which may include typing, two hours regular work non-typing, two hours of regular work typing and then she'll be considered off two hours so that her total workday will be six hours at this point."

If Dr. Melhorn had believed that it was use of the mouse that was causing Depew's symptoms, he easily could have restricted that

discrete activity—in particular, using the mouse to produce drawings.

The Court of Appeals found it significant that "two doctors testified that Depew did not have any aggravation of her right hand after she returned to work." 23 Kan. App. 2d at 468. The two doctors who testified were Dr. Lucas and Dr. Jones. We do not interpret the testimony of either doctor as did the Court of Appeals. There is apparently some confusion caused by use of the word "aggravation" to mean an increase or worsening of symptoms rather than repetitive trauma, as it was used by this court in *Murphy*. Dr. Lucas' testimony is not very clear, but we do not interpret it as rejecting the proposition that there was aggravation of her right hand after Depew returned to work after surgery. Dr. Jones expressly stated that the condition in Depew's right hand was aggravated by her returning to her work activities. It is entirely possible that Dr. Jones was not using "aggravated" as it was used in *Murphy*, but, even so, there is no basis for the Court of Appeals' statement.

The Court of Appeals believed that it had found in the medical evidence a basis for concluding that the injury to Depew's left hand was caused by her use of the mouse in that hand. Although the medical evidence possibly may be susceptible to differing inferences, it leads to the conclusion that Depew's left hand became symptomatic during the period when she was using the mouse with her left hand but not to the conclusion that using the mouse was specified to be the cause of the injury to her left forearm. Asked whether there was a causal relationship between the conditions of the right and left forearm, Dr. Jones answered:

"A. Usually what we see, if they got a bilateral they get one done, as soon as one is done and then the opposite one starts giving them more problems.

"Q. So is there a causal relationship, in your opinion, between the right carpal tunnel and the developing of symptoms with respect to the right carpal tunnel?

"A. The right one's bound up for six weeks and they overuse it and probably get symptoms because of that.

"Q. When you say overuse it, you're mentioning the left hand?

"A. That's correct."

The Court of Appeals seems to have viewed this testimony as establishing that "the *aggravation* of her left arm occurred after she

returned to work." (Emphasis added.) 23 Kan. App. 2d at 468. A careful reading of the questions and answers, however, shows that a more plausible interpretation is that Dr. Jones based his responses on the premise that the aggravation, as that term is used in *Murphy* to signify the repetitive trauma, had damaged both forearms before surgery was performed on one. He stated his premise as follows—"if they got a bilateral they get one done." After surgery on one forearm, heavier than usual use of the other leads to manifestation of symptoms in it.

Dr. Lucas agreed that "if it hadn't been for the problems on the right side, the problems on the left probably wouldn't have occurred" and that "unless and except for th[e] type of work, these symptoms would not have developed in the left hand."

Dr. Melhorn's records, in particular the restrictions he placed on Depew's work activities, do not support the Court of Appeals' interpretation. Use of the mouse is never specified as an activity to be avoided or limited. Typing, key entry, and other activities involving repetitive movements were identified.

Depew's testimony is the only evidence from which the Court of Appeals could have inferred that a one-handed activity caused Depew's injury. One of the tasks she performed was making detailed drawings, which relied to a great extent on use of the computer mouse. She testified that on average she spent one workday a week making drawings. She held the mouse with her right hand until after she returned to work after her surgery when she started using her left hand "because [her] right hand was hurting." In addition to using her left hand for the mouse, she used it "for everything that [she] could use it for," including carrying bulky loads. She testified that in July her left hand started tingling and within 2 to 3 weeks pains were shooting up her left arm. Her injury is compression of nerves in her forearms as a result of repetitive trauma. It is an injury which may not be diagnosed or manifested until the trauma has been discontinued, thus complicating correlation of pain with the cause of the damage. She did not render an opinion, nor, as a layperson, could she as to the cause of damage to a nerve or nerves.

Generally, a finding by the Board will be upheld by an appellate court if it is supported by substantial competent evidence, which has been defined by this court as "evidence possessing something of substance and relevant consequence, and carrying with it fitness to induce conviction that the award is proper, or furnishing substantial basis of fact from which the issue tendered can be reasonably resolved." *Gleason v. Samaritan Home*, 260 Kan. 970, Syl. ¶ 2, 926 P.2d 1349 (1996). In the present case, neither the ALJ nor the Board made a specific finding of the proximate cause of Depew's condition. Thus, when the Court of Appeals specified use of the mouse as the cause and based its decision in large measure on that cause being a one-handed activity, it was enlarging upon the Board's findings. Even applying the deferential standard for judicial review of agency findings, the Court of Appeals' finding cannot be sustained.

All the medical evidence indicates that it was the two-handed activity of use of the computer keyboard, which at times would include use of the mouse, that led to the development of Depew's condition. The sequential manifestation of the injuries does not lead to a different conclusion. In fact, it is entirely consistent with this court's understanding of repetitive trauma injuries to the forearms of workers as expressed, for example, in *Murphy*.

In *Murphy*, IBP argued that there must be a simultaneous injury to both arms rather than an injury resulting from simultaneous periods of aggravation. In rejecting IBP's argument, this court adopted the reasoning of the Court of Appeals in *Downes v. IBP, Inc.*, 10 Kan. App. 2d 39, 691 P.2d 42 (1984), *rev. denied* 236 Kan. 875 (1985):

" '1. As early as 1919 a compensable "accident," as understood in workers' compensation law, was defined to include a situation where the physical structure of the worker gives way under the stress of usual labor. *Gilliland v. Cement Co.*, 104 Kan. 771, 777, 180 Pac. 793 (1919).

" '2. In 1949 the court stated, "[i]f injury occurring as the result of a single accident is compensable, surely we will not declare that injury resulting from a dozen or more of the same or similar accidents, all occurring in the course of the employment, is noncompensable." *Winkelman v. Boeing Airplane Co.*, 166 Kan. 503, 508, 203 P.2d 171 (1949). See also *Demars v. Rickel Manufacturing Cor-*

*poration*, 223 Kan. 374, 573 P.2d 1036 (1978).' *Downes v. IBP, Inc.*, 10 Kan. App. 2d at 41." 240 Kan. at 144.

This court added that aggravation to Murphy's arms and hands was simultaneous even though the injuries had not manifested themselves absolutely simultaneously. Although the court did not eliminate the requirement of simultaneous aggravation, it permitted nonsimultaneous manifestation of forearm injuries to be treated as a general bodily disability. The holding was stated as follows: "[W]here a claimant's hands and arms are simultaneously aggravated, resulting in work-related injuries to both hands and arms, the injury is compensable as a percentage of disability to the body as a whole under K.S.A. 44-510e." 240 Kan. at 145.

Here, as in *Murphy*, the aggravation to Depew's left and right forearms was simultaneous. We find no substantial competent evidence to the contrary and, therefore, pursuant to the rule set out in *Murphy*, Depew's injuries are compensable as a percentage of disability to the body as a whole and not in separate scheduled injuries.

In the Court of Appeals, Depew also argued that the Board's decision violated her right to equal protection under the federal Constitution. The Court of Appeals observed that Depew had not raised the issue below and stated: "Where constitutional grounds for reversal are asserted for the first time on appeal, they are not properly before the appellate court for review. *Murphy*, 240 Kan. at 148." 23 Kan. App. 2d at 470. Thus, the issue is not before us in this appeal.

We reverse the judgment of the Court of Appeals, reverse the order of the Board, and reinstate the ALJ's award.