(128 P.3d 401)
No. 93,984

ALEJANDRO CASCO, *Appellant,* v. ARMOUR SWIFT-ECKRICH, *Appellee.*

Original opinion filed December 2, 2005. Modified opinion filed December 19, 2005.

*Jeff K. Cooper,* of Topeka, for appellant.

*Mark E. Kolich,* of Lenexa, for appellee.

Before RULON, C.J., PIERRON and HILL, JJ.

HILL, J.: We are asked to decide in this case if Alejandro Casco should receive either workers compensation for a permanent partial general disability or compensation for two separate scheduled injuries. Casco, from repetitive work, first hurt his left shoulder and then, because he was compensating for that injury, his right shoulder hurt from overuse. We reverse and remand to the Workers Compensation Board (Board) with directions to resolve the issue of work disability.

*Work and Injury History*

Casco's employment with the defendant required him to perform repetitive work with both of his upper extremities. His duties included looping and tying sausages, hanging sausages above shoulder level on a chain, filling boxes with meat, carrying 30- to 40-pound boxes, and placing the boxes on pallets.

Casco felt pain in his left shoulder while performing his job and went to the nurse on June 8, 2000. The defendant provided treatment for Casco and had him evaluated by Occupational Health Clinic, Scott Ketcher, D.O., and Geary Community Hospital. Casco's treatment consisted of radiographic studies, cortisone injections, physical therapy, medications, and work modifications. Casco showed little improvement during this treatment.

Eventually, Casco was examined by Larry F. Frevert, M.D. After an arthrogram, Casco was diagnosed as having a rotator cuff tear. Consequently, Casco was placed on work restrictions, which included no use of his left arm. Casco received a left rotator cuff exploration and repair and then continued with physical therapy. Casco testified that after the surgery, he returned to work and performed his work primarily with his right arm due to discomfort in the left arm as well as the work restrictions he was placed on after the surgery. Frevert ordered Casco to not use his left arm for activities.

Due to continuing discomfort in the left shoulder, a second arthrogram was performed in September 2001. Results of this arthrogram showed a recurrent rotator cuff tear. In February 2002, Casco underwent a left open rotator cuff repair with lysis of adhesions. Casco also continued rehabilitation of the shoulder. During a February 20, 2002, check-up, Frevert ordered Casco to remain off work for 5 weeks. This time off was extended for another 4 weeks at Casco's next evaluation. On May 8, 2002, Frevert allowed Casco to return to work but with the restrictions that he could not use his left arm for over the shoulder work and that he could only perform sit-down duties. Once again Casco testified that he returned to work after the surgery and performed his duties using only his right arm.

Casco testified that after he returned to work from his second shoulder surgery, he began experiencing pain in his right shoulder. Casco testified that he first began experiencing pain in his right shoulder in August 2002. During the time Casco began experiencing right shoulder pain, he continued to experience pain in his left shoulder. Casco first complained of his right shoulder pain to Frevert in September 2002. Frevert suggested a right shoulder MRI, but this was not authorized by the defendant.

Then in February 2003, Casco filed an application for a preliminary hearing with the Kansas Division of Workers Compensation. After the hearing, the Administrative Law Judge (ALJ) ordered the defendant to pay for treatment to both of Casco's upper extremities, with treatment to be provided by Frevert. At that time an MRI was performed on Casco's right shoulder. The MRI showed "some impingement syndrome with some swelling of the rotator cuff musculature and no evidence of rotator cuff tear." On May 30, 2003, Frevert performed decompression surgery on Casco's right shoulder. After the surgery, Frevert had Casco undergo physical therapy and directed Casco to stay off work from April 12, 2003, through October 16, 2003.

On October 16, 2003, Frevert released Casco to work with restrictions. These restrictions included no overhead activity, no lifting greater than 5-10 pounds, and no exposure to temperatures below 40 degrees. On October 17, 2003, Casco presented the defendant with his restrictions. At that point, the defendant told Casco that no employment was available. The defendant told Casco that his return to work would be coordinated with Casco's attorney.

Then Casco moved to Maryland to live with his son. In a letter dated November 5, 2003, the defendant's attorney notified Casco's attorney that the defendant had work available within Casco's restrictions and requested Casco to report to work immediately. The letter stated that if Casco did not report to work by November 10, 2003, the defendant would consider Casco to have voluntarily terminated his employment. In a letter dated November 6, 2003, Casco's attorney forwarded the defendant's letter to Casco's Junction City address. Casco testified that he received his attorney's letter in Maryland on November 12, 2003, which was 2 days after

the reporting date set by the defendant. Casco testified that he could not financially afford to return immediately, that he told his attorney that he could not return, and that he eventually returned to work on November 24, 2003. However, Casco testified that when he showed up for work, he was informed that they did not have any work for him.

Sergio Delgado, M.D., evaluated Casco on three different occasions. He found that most of Casco's shoulder symptoms were "aggravated by activities using both arms, particularly from waist to overhead level." Dr. Delgado also testified that he agreed that Casco's right shoulder problems were "mainly due to overuse and compensation for the left shoulder problems." However, Delgado went on to say that it would be fair to assume that if Casco did not perform work activities, there would be nothing to cause injury to his right shoulder.

After an evaluation in November 2003, Dr. Delgado opined that Casco suffered from a "27% left upper extremity impairment rating which would translate to a 16% whole person impairment." Delgado further found that Casco suffered from a 6% right shoulder or right upper extremity impairment, which would translate to a 4% whole person impairment. He combined the values and found a 19% whole person impairment. The doctor also restricted Casco's future work activities by stating:

"Restrictions for future work activities continue to be avoiding activities requiring pushing and pulling not to exceed 50 pounds repetitively and 70 pounds occasionally. Avoid lifting from the floor not to exceed 40 pounds occasionally and from the waist to overhead levels to be minimal in nature not to exceed 5-10 pounds occasionally and [n]o repetitive lifting."

Dr. Delgado also reviewed a list of tasks Casco had performed in jobs during the 15 years preceding June 8, 2000, which was the stipulated date of the accident. The work task list was compiled by Monty Longacre, a vocational rehabilitation counselor and job placement specialist, after conducting a telephone interview with Casco. After reviewing the task list, Delgado concluded that Casco could not perform 10 of the 20 tasks due to his shoulder injuries. Another vocational rehabilitation counselor, Terry Cordray, interviewed Casco and compiled a 15-year work task list. Delgado re-

viewed this task list and determined that Casco could not perform 5 of the 15 tasks set out by Cordray. Dr. Delgado testified, in part:

"Q. [Mr. Kolich] Okay. Now, Doctor, with regard to the right shoulder I think you've indicated that you feel that that shoulder became injured because he was over compensating [*sic*] for the other shoulder. Is that true?

"A. [Dr. Delgado] That is very frequently seen where when there's limitation of motion, weakness or pain, the other shoulder is overloaded if he continues to do the same activities as before or similar to them.

"Q. And when you say same activities, you are specifically referring to his work activities, is that true?

"A. Yes.

"Q. Because would it be fair to assume if he wasn't doing the work activities, there would be nothing to cause an injury to that right shoulder, would there?

"A. That would be correct.

"Q. When he testified back in February of 2003, he was asked about that, and his — well, I'll read you the question and the answer. The question is on Page 23, 'And did I understand your testimony earlier the reason your right shoulder became a problem was you weren't even using your left arm because of your left shoulder problem. You were doing everything with your right arm,' and his answer was 'Yes.' Would that be consistent with what he told you?

"A. Yes.

"Q. And of course, Doctor, if he wasn't using his left arm at all, there was no — that wouldn't cause any aggravation or the continued aggravation of the left shoulder, would it?

"A. It should not."

### History of Administrative Procedures

An ALJ held a hearing on Casco's claims in April 2004. At the time of the hearing, Casco was living in Maryland. Casco testified that he had not worked since his job with the defendant, but he had applied for jobs in Maryland. A list of places and people Casco claimed he contacted about a job was admitted into evidence at the hearing.

The ALJ issued an award and found that Casco's right shoulder injury was a natural and probable consequence of the left upper extremity injury. Accordingly, the ALJ found that Casco's injuries should be treated as a whole body injury. After analyzing testimony

regarding Casco's task and wage loss, the ALJ awarded Casco a 69.5% work disability. Casco's total award was capped at $100,000.

In due course the Board reviewed the award. The Board found that Casco's injury to his right shoulder resulted from a separate accident, and, therefore, the natural and probable consequence rule could not be used to treat Casco's injuries as a whole body injury instead of two separate scheduled injuries. The Board awarded Casco a 27% permanent partial disability to the left upper extremity at the shoulder level and 6% permanent partial disability to the right upper extremity at the shoulder level. Casco's total award was $30,341.30 for the left shoulder injury and $4,337.69 for the right shoulder injury.

Casco now claims the Board erred in awarding compensation based on two scheduled injuries under K.S.A. 44-510d rather than a general whole body disability under K.S.A. 44-510e. Casco's claim is based on the allegation that his right shoulder injury was a natural and probable result of his left shoulder injury.

*Scope of Review*

The Board's decision in this case was based on a finding that Casco's right shoulder injury was the result of a separate accident. According to *Frazier v. Mid-West Painting, Inc.*, 268 Kan. 353, 356, 995 P.2d 855 (2000), this issue is a question of law over which this court's review is unlimited.

The defendant claims the Board made a negative finding that Casco did not meet his burden of proof, and, therefore, Casco must show arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion, or prejudice in order to prevail. *Nance v. Harvey County*, 263 Kan. 542, 551, 952 P.2d 411 (1997). But this case is distinguishable from *Nance*. Here, the Board did not find that Casco failed to show that his right shoulder injury was a natural and probable result of left shoulder injury. Instead, the Board found that Casco's right shoulder injury resulted from a new and separate accident so, under *Stockman v. Goodyear Tire & Rubber Co.*, 211 Kan. 260, 505 P.2d 697 (1973), Casco's injuries fell under K.S.A. 44-510d and not 44-510e. This is a positive find-

ing. Accordingly, the standard of review used in *Nance* is not applicable.

*Analysis*

K.S.A. 44-510d provides for the amount of compensation to be awarded for specific permanent partial disabilities that fall within the schedule. K.S.A. 44-510d(a)(13) sets forth the compensation to be awarded for the loss of an arm including or excluding the shoulder joint, shoulder girdle, shoulder musculature, or any other shoulder structures. Additionally, K.S.A. 44-510d(b) states in relevant part: "Whenever the employee is entitled to compensation for a specific injury under the foregoing schedule, the same shall be exclusive of all other compensation . . . and no additional compensation shall be allowable or payable for any temporary or permanent, partial or total disability. . . ."

K.S.A. 44-510e provides for the amount of compensation to be awarded for temporary or permanent partial general disabilities. This statute states that a permanent partial general disability exists "when the employee is disabled in a manner which is partial in character and permanent in quality and which is not covered by the schedule in K.S.A. 44-510d and amendments thereto." K.S.A. 44-510e(a). It appears both of Casco's shoulder injuries are compensable under K.S.A. 44-510d. Thus, Casco would generally be precluded from compensation under K.S.A. 44-510e.

Casco claims the secondary disability rule set forth in *Jackson v. Stevens Well Service*, 208 Kan. 637, 493 P.2d 264 (1972), allows him compensation under K.S.A. 44-510e. In *Jackson*, the court found that an employee who had sustained injuries to fingers on both hands and several months later complained of pain in his right shoulder and arm was entitled to temporary total disability benefits when the employee was diagnosed with having tendinitis in his right shoulder and the doctor testified the right shoulder injury was a direct result of the initial accident. In reaching this conclusion, the court stated:

"We find that when a primary injury under the Workmen's Compensation Act is shown to have arisen out of and in the course of employment every natural con-

sequence that flows from the injury, including a new and distinct injury, is compensable if it is a direct and natural result of a primary injury." 208 Kan. at 643.

We point out that while the secondary disability rule only states that injuries that are a natural and direct result of another compensable injury are also compensable, it appears that if the secondary injury is to a parallel limb, then the presumption set forth in K.S.A. 44-510c(a)(2) applies. This point has not been challenged by either party. When courts have found that the secondary disability rule applies, they have found that the employee is not required to give notice of the second injury under the notice provisions in the Workers Compensation Act since the second injury is treated as part of the first injury. The same reasoning applies here. Since a second injury to a parallel limb would be considered part of the first injury, the injuries would be considered to be simultaneous.

The rule in *Jackson* was later limited by *Stockman v. Goodyear Tire & Rubber Co.*, 211 Kan. 260, 505 P.2d 697 (1973). In *Stockman*, the employee suffered a work-related back injury. It was stipulated that this injury was compensable. The day after the employee was released to return to work, the employee again injured his back while at home as he bent down to pick up a tire. A doctor testified that he believed the employee's later injury was a continuation of his original injury. On appeal, the employee argued that his later injury was compensable as a natural consequence of his original injury. The court addressed this argument by limiting the *Jackson* ruling:

"The rule in *Jackson* is limited to the results of one accidental injury. The rule was not intended to apply to a new and separate accidental injury such as occurred in instant case. The rule in *Jackson* would apply to a situation where a claimant's disability gradually increased from a primary accidental injury, but not when the increased disability resulted from a new and separate accident." 211 Kan. at 263.

In this case, Casco claims that his right shoulder injury was a direct and natural result of his left shoulder injury and the rule in *Jackson* applies. The respondent claims the limitation set forth in *Stockman* is applicable because in its view Casco's right shoulder injury was the result of a separate accident, and, therefore, his

injuries should not be treated as a permanent partial general disability. In order to determine which argument is valid, a review of cases discussing the *Jackson* secondary disability rule and the *Stockman* limitation is necessary.

Casco cites three cases, *Woodward v. Beech Aircraft Corp.*, 24 Kan. App. 2d 510, 949 P.2d 1149 (1997), *Frazier*, and *Wall v. Gage Bowl, Inc.*, No. 89,350, unpublished opinion filed April 18, 2003, in support of his claim. We look at the three in order.

In *Woodward*, the employee twisted his left knee after stepping on an air hose. After having surgery performed on his left knee, the employee returned to work and began experiencing pain in his right knee, on which he had three prior surgeries. The employee later experienced pain in both knees, with his left knee buckling occasionally. The ALJ awarded compensation for the left knee only, but the Board found that the aggravation to the employee's right knee was a result of overcompensating for the left knee and found that the employee suffered bilateral knee injuries arising from the employee's original accident. The Board found the employee suffered a nonscheduled injury and awarded compensation pursuant to K.S.A. 44-510e. On appeal, the court in *Woodward* found that substantial competent evidence existed to support a finding that the aggravation to the employee's right knee was a result of the employee's left knee injury.

In *Frazier*, the employee suffered a repetitive use injury to his right forearm and shoulder in the course of his employment. After a surgery was performed, the employee participated in a prescribed work-hardening program and a functional capacity evaluation. A doctor later found that the employee's participation in the work-hardening program and the functional capacity evaluation permanently aggravated the employee's preexisting back condition. The ALJ denied compensation for the employee's back injury due to the employee's failure to timely notify the employer of the injury. This decision was affirmed by the Board and the Court of Appeals

Then, the Kansas Supreme Court compared the employee's situation in *Frazier* to the situation presented in *Chinn v. Gay & Taylor, Inc.*, 219 Kan. at 196, 547 P.2d 751 (1976), where an employee who suffered a knee injury and later developed a back prob-

lem due to the employee's limping gait. The court in *Chinn* found that the employee's back problem was a natural consequence of the knee injury and, therefore, found the back problem to be compensable. 219 Kan. at 201. The court in *Frazier* also discussed *Roberts v. Krupka,* 246 Kan. 433, 442, 790 P.2d 422 (1990). In *Roberts,* the court held: "Where an injury is compensable under the Workers Compensation Act (K.S.A. 44-501 *et seq.*), any aggravation of that injury or additional injury arising from medical malpractice in the treatment thereof is a consequence of the primary injury and compensable under the Act." 246 Kan. at 442.

After examining the *Chinn* and *Roberts* decisions, the *Frazier* court held that the employee's injury to his back during the work-hardening program and functional capacity evaluation was a part of his treatment for his forearm and shoulder injury. Accordingly, the aggravation of the employee's back injury was a natural consequence of his forearm and shoulder injury. Thus, the employee was not required to give notice under K.S.A. 44-520 and K.S.A. 44-520a of the back injury and it should have been considered for compensation. As a result, the case was reversed and remanded for further proceedings.

Finally, in *Wall,* the employee injured her left elbow during the course of her employment. After returning to work, she began to experience pain in her right arm. The employer agreed that the employee's right arm injury was " 'caused by her work activities and repetitive use at work of her right arm.' " An independent examiner rated the employee as having 10% permanent partial impairment to her right arm and 15% permanent partial impairment to her left arm. The independent examiner also rated the employee as having a 15% impairment of the whole person. The independent examiner also found that the employee could not perform 9 of the 11 tasks she would have been asked to perform for employer.

In *Wall,* the ALJ found that the employee's right arm injury was a direct and natural consequence of the left arm injury and, accordingly, treated the injuries as injuries to the body as a whole. In affirming the ALJ's award, the Board noted that the employee's injuries resulted in an 82% task loss. On appeal, the employer

claimed the employee's injuries should have been compensated as two separate scheduled injuries.

Concerning *Wall*, we recognize that Rule 7.04(f)(2) (2004 Kan. Ct. R. Annot. 47), states that unpublished memorandum opinions are not binding precedents, except under the doctrines of law of the case, res judicata, and collateral estoppel, and are not favored for citation. But unpublished memorandum opinions may be cited if they have persuasive value with respect to a material issue not addressed in a published opinion of a Kansas appellate court and if they would assist the court in its disposition.

In *Wall*, the employer claimed on appeal that the employee's right arm injury was the result of subsequent work activities and not a natural and direct result of her left elbow injury. The court noted that the independent examiner's testimony indicated that the employee's right arm injury was caused by overuse and "was not simply caused by work-related activities but also by the normal daily activities which claimant was forced to perform with only one arm." The court went on to find that sufficient evidence existed to find that the employee's injuries to both arms caused substantial impairment. The court further found that when a second injury would not have occurred "but for" the original injury, an award for a general bodily disability may be proper.

In response to Casco's argument, the defendant cites *Wietharn v. Safeway Stores, Inc.*, 16 Kan. App. 2d 188, 195, 820 P.2d 719, *rev. denied* 250 Kan. 808 (1991), and *Depew v. NCR Engineering & Mfg.*, 23 Kan. App. 2d 463, 932 P.2d 461, *reversed on other grounds* 263 Kan. 15, 947 P.2d 1 (1997).

In *Wietharn*, the employee injured his knee on December 31, 1983, as a result of an accident at work. The employee returned to work on May 21, 1984. The employee testified that on June 20, 1984, he injured his back after his previously injured knee gave out and caused him to fall against a pallet where cases of vegetables were being stacked. The employee did not file an accident report regarding the June 20, 1984, fall until October 1985, and he did not file a claim for compensation until December 1985.

In *Wietharn*, the ALJ awarded the employee a 7.5% permanent partial disability to the body as a whole. The Workers Compensa-

tion Director (the Director) modified the award to deny any claim by the employee due to the employee's failure to timely notify the employer of the accident and the employee's failure to timely file a written claim for compensation. The district court adopted the findings of the Director. On appeal, the employee claimed his back injury was a natural and probable result of his knee injury. In discussing this issue, the court stated:

"Of primary importance in the instant case is the fact that an entirely different body part was injured. While Dr. Payne's clinical notes indicate that claimant indicated as early as March 1984 that his knee tended to give way and Dr. Payne testified that it was possible claimant's knee could and would give way in the future, such testimony does not necessitate a finding that the second accident was a natural and probable result of the first accident. The claimant argues that his weakened knee caused his fall and, as such, the second injury is a natural result. We believe this approach was rejected in *Stockman.*" 16 Kan. App. 2d at 196.

*Wietharn* is clearly distinguishable from the present case in that the employee in *Wietharn* did not suffer a repetitive use injury due to overcompensation.

In *Depew*, the employee worked as a secretary. The employee's work required her to use a computer, including extensive use of a computer mouse. In the fall of 1990, the employee began experiencing pain in her right arm and was diagnosed with right carpal tunnel syndrome. After surgery, the employee was released to work without restrictions on May 6, 1991. The employee testified that after returning to work she continued to have pain in her right arm, so she began using her left arm to do her work. By September 13, 1991, the employee developed carpal tunnel syndrome in her left arm.

In *Depew*, the ALJ entered an award for a scheduled injury to the employee's left arm and a partial general disability for the injury to the employee's right arm. The Board modified the award by finding that the employee suffered two separate scheduled injuries. The employee appealed. On appeal, the court first determined that the employee's failure to show simultaneous aggravation of both arms due to repetitive use prevented her from claiming a general bodily disability rather than two separate scheduled injuries. The employee also claimed she was entitled to a general disability under

the secondary disability rule. The court held that the Board's finding that the employee's injury to her left arm resulted from a new and separate accident foreclosed the application of the secondary disability principle. 23 Kan. App. 2d at 469.

It should be noted that the Court of Appeals opinion in *Depew* was reversed by the Kansas Supreme Court in *Depew v. NCR Engineering & Manufacturing*, 263 Kan. 15, 947 P.2d 1 (1997). While the Supreme Court in *Depew* agreed that the employee had to show simultaneous injuries, the Supreme Court disagreed that the facts of the case supported the Court of Appeals decision. The court stated that the sequential manifestation of the injuries did not lead to a different result and was, in fact, consistent with the court's understanding of repetitive use injuries. The court went on to hold that the facts showed that the employee's injuries to her arms were simultaneous and, therefore, compensation for general bodily disability was proper. 263 Kan. at 27.

In the present case, Casco has not claimed that the injuries to his shoulders were simultaneous. Thus, the Supreme Court's decision in *Depew* is not relevant to the case at bar.

The line of cases beginning with *Jackson* including *Woodward*, *Frazier*, and *Wall* are persuasive under the facts here. We find as a matter of law find that the relationship between the two injuries in the present case is so strong that the right shoulder injury should be viewed more as a continuation of the left shoulder injury and not as a separate accident. As the ALJ found,

"Dr. Delgado, is the only physician to testify in this matter. He stated the Claimant suffers a persistent left shoulder rotator cuff tear and an impingement syndrome to the right shoulder. He opined the right impingement syndrome is attributable to overuse of that extremity due to compensation for the injury to the left shoulder."

By ignoring that evidence, the Board erroneously found the "appropriate question is not whether the injuries are somehow related. The controlling issue instead is whether a new accident has occurred." Such a ruling totally discards the rule in *Jackson/Frazier* and replaces it totally with *Stockman*. We are mindful that these are repetitive use injuries, not injuries incurred as a result of

trauma. No work accommodations were made for Casco. The nature of the injuries to parallel limbs controls.

Reversed and remanded to the Workers Compensation Board with directions to resolve the issue of work disability.