(885 P.2d 1261)
No. 71,007

BOBBY G. BERRY, *Claimant/Appellant*, v. BOEING MILITARY AIRPLANES, *Respondent/Appellee*, AETNA CASUALTY & SURETY, *Insurance Carrier/Appellee*, and KANSAS WORKERS COMPENSATION FUND, *Appellee*.

Opinion filed December 9, 1994.

*William L. Fry*, of Wichita, for appellant.

*Vaughn Burkholder* and *Stephen M. Kerwick*, of Foulston & Siefkin, of Wichita, for appellees Boeing Military Airplanes and Aetna Casualty & Surety.

Before LEWIS, P.J., RULON, J., and TERRY L. BULLOCK, District Judge, assigned.

*Per Curiam*: This is a workers compensation action in which claimant, Bobby G. Berry, appeals from the factual findings of the Workers Compensation Board of Review (Board) as to his date of injury and extent of disability. Respondent Boeing Military Airplanes, insurance carrier Aetna Casualty & Surety Company, and the Workers Compensation Fund previously stipulated to the apportionment of liability among them. Consequently, there are no related issues except for claimant's appeal. We affirm in part, reverse in part, and remand for further proceedings.

. The essential facts are as follows:

According to the findings of the Administrative Law Judge (ALJ), adopted by the Board, on May 12, 1987, claimant injured his left ring finger while working for respondent. Claimant was a sheet metal worker, and the injury occurred while he was using a rivet gun. As the pain in his finger did not subside, claimant visited respondent's medical center on May 15, 1987. On May 19, 1987, claimant filed a disability benefit claim form, claiming work-related problems with his left fingers and hand.

On June 2, 1987, claimant saw Dr. Lucas, a board certified orthopedic surgeon. Dr. Lucas diagnosed claimant as having carpal tunnel syndrome in his left wrist. As this prevented claimant from painlessly performing sheet metal work, claimant was transferred to the panel shop. This job, however, exceeded claimant's weight restrictions and aggravated his condition. Claimant was then asked to transfer to a department where he would work with small parts—a position more accommodating to his injury. However, this new position paid 10% less than claimant's previous job. Claimant agreed to take the new job, in spite of the reduced pay, until he learned that he would also be required to work a great deal of overtime. Unwilling to work the increased hours, claimant was fired.

On September 30, 1987, Dr. Lucas performed surgery on claimant's left wrist. Although surgery alleviated the pain in his left hand, claimant soon began developing symptoms in his right hand. The same operation was performed on November 20, 1987, on claimant's right wrist. On July 11, 1988, claimant filed a claim with the Division of Workers Compensation. On May 26, 1990, claimant saw Dr. Artz and reported that the surgery performed by Dr. Lucas only minimally improved his condition. Claimant was given cortisone injections, which temporarily alleviated his pain; however, he eventually had to have surgery on both hands in February and March of 1992.

On July 30, 1993, claimant submitted his case to the ALJ. The ALJ determined the date of claimant's bilateral carpel tunnel syndrome to be August 27, 1987, as that was the last day claimant worked for respondent. Accordingly, the ALJ applied the law in

effect on that date. The ALJ found that claimant had introduced no evidence concerning his inability to perform work in the open labor market, nor did he introduce evidence regarding his inability to earn comparable wages. The ALJ concluded claimant was not entitled to work disability and limited claimant's disability rating to a functional impairment of 5% in each arm, for a general impairment of 10%.

Claimant applied for review by the Board. The Board found that the date of claimant's work accident was the last day claimant worked. The Board, however, disagreed with the ALJ that claimant had a 10% functional impairment, as this impairment rating was based upon the testimony of Dr. Artz, who did not see claimant until long after he was terminated by respondent. Nonetheless, the Board affirmed the award. The Board found there was sufficient evidence offered to show that claimant's ability to earn a comparable wage had been reduced by 10%. This conclusion was based upon the fact that claimant could have taken another job with respondent which paid 10% less than his previous salary.

Claimant appeals to this court, alleging his "date of accident" occurred prior to July 1987. As such, claimant argues the post-July 1987 law which requires evidence as to loss of access to the open labor market and loss of the ability to earn comparable wages is inapplicable. Additionally, claimant argues that even under the amended statute, he provided the factfinder with sufficient evidence to show that his loss of access to the open labor market and loss of the ability to earn comparable wages has been affected by his injury and that he is entitled to an award greater than 10%.

## STANDARD OF REVIEW

K.S.A. 44-556 specifically subjects workers compensation appeals to the Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601 *et seq.* That Act limits the relief granted on appeal. K.S.A. 77-621(c). K.S.A. 77-621(c)(4) and (7) are relevant for purposes of this appeal:

"The court shall grant relief only if it determines any one or more of the following:

. . . .
"(4) the agency has erroneously interpreted or applied the law;

. . . .
"(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act."

The 1993 workers compensation amendments limited review of all orders issued after October 1, 1993, to questions of law. K.S.A. 44-556(a). However, whether the Board's findings of fact are supported by substantial competent evidence (K.S.A. 77-621[c][7]) is a question of law. *Tovar v. IBP, Inc.*, 15 Kan. App. 2d 782, 784, 817 P.2d 212, *rev. denied* 249 Kan. 778 (1991).

## DATE OF INJURY

One method of determining whether the Board accurately found the date of accident might be to determine whether carpal tunnel syndrome is a personal injury caused by accident or an occupational disease. The distinction has not been addressed by the appellate courts of this state. If it is an occupational disease, the injury is deemed to have "occurred" on the last day worked. K.S.A. 44-5a06. However, if it is a condition caused by an accident, the injury is deemed to have "occurred" on the date of the injury. K.S.A. 44-510e(a).

According to K.S.A. 44-508(d):

" 'Accident' means an undesigned, sudden and unexpected event or events, usually of an afflictive or unfortunate nature and often, but not necessarily, accompanied by a manifestation of force. The elements of an accident, as stated herein, are not to be construed in a strict and literal sense, but in a manner designed to effectuate the purpose of the workers compensation act that the employer bear the expense of accidental injury to a worker caused by the employment."

Similarly, K.S.A. 44-5a01(b) states in part:

" 'Occupational disease' shall mean only a disease arising out of and in the course of the employment resulting from the nature of the employment in which the employee was engaged under such employer, and which was actually contracted while so engaged. 'Nature of the employment' shall mean, for purposes of this section, that to the occupation, trade or employment in which the employee

was engaged, there is attached a particular and peculiar hazard of such disease which distinguishes the employment from other occupations and employments, and which creates a hazard of such disease which is in excess of the hazard of such disease in general. The disease must appear to have had its origin in a special risk of such disease connected with the particular type of employment and to have resulted from that source as a reasonable consequence of the risk."

Carpal tunnel syndrome could be construed to fall within the boundaries of either of the above definitions.

"[Historically,] the two crucial points of distinction between accident and occupational disease were the element of unexpectedness and the matter of time-definiteness. What set occupational disease apart from accidental injuries was both the fact that they could not honestly be said to be unexpected, since they were recognized as inherent hazard[s] of continued exposure to conditions of the particular employment, and the fact that they were gradual rather than sudden in onset." 1B Larson, The Law of Workman's Compensation § 41.31 (1992).

The decisions in other states regarding this issue are inconsistent. At least five states, Illinois, Indiana, Minnesota, Nebraska, and Tennessee, have found carpal tunnel syndrome to fall within their statutory definition of accident. See *Peoria County Belwood v. Ind. Com.*, 115 Ill. 2d 524, 505 N.E.2d 1026 (1987); *Duvall v. ICI Americas, Inc.*, 621 N.E.2d 1122 (Ind. App. 1993); *Jones v. Thermo King*, 461 N.W.2d 915 (Minn. 1990); *Schlup v. Auburn Needleworks, Inc.*, 239 Neb. 854, 479 N.W.2d 440 (1992); *Barker v. Home-Crest Corp.*, 805 S.W.2d 373 (Tenn. 1991).

Alternatively, at least four other states, Idaho, Louisiana, Maryland, and Missouri, have determined that under their state statutes, carpal tunnel syndrome is not an accident but an occupational disease. *Kinney v. Tupperware Co.*, 117 Idaho 765, 792 P.2d 330 (1990); *Freeman v. Poulan/Weed Eater*, 618 So. 2d 618 (La. App. 1993); *Lettering v. Guy*, 321 Md. 305, 582 A.2d 996 (1990); *Jackson v. Risby Pallet & Lumber Co.*, 736 S.W.2d 575 (Mo. App. 1987).

According to Professor Larson, there are two alternative criteria for determining the date of accident where the injury is gradual. The first is the time at which the employee can no longer perform his or her job. The other is the onset of pain which necessitates medical attention. 1B Larson, The Law of Workman's Compensation § 39.50.

Illinois formulated a third method to fix the date of injury—when the employee becomes aware of the injury and aware of its relation to the job. In 1987, the Illinois Supreme Court heard *Peoria County Belwood v. Ind. Com.,* 115 Ill. 2d at 531, and concluded:

"We therefore hold that the date of an accidental injury in a repetitive-trauma compensation case is the date on which the injury 'manifests itself.' 'Manifests itself' means the date on which both the fact of the injury and the causal relationship of the injury to the claimant's employment would have become plainly apparent to a reasonable person."

However, this bright line test was later greatly weakened. In *Oscar Mayer & Co. v. Industrial Comm'n,* 176 Ill. App. 3d 607, 531 N.E.2d 174 (1988), the Illinois Court of Appeals acknowledged that an employee who continues to work on a regular basis despite his or her own progressive ill-being should not be punished merely for trying to perform his or her duties without complaint. Indeed, some employees might realize that there is a problem many years before that problem actually prevents the employee from working. Under the *Peoria Belwood* rule, employees were either forced to submit a claim before they were actually disabled, or if they waited, they would be *unable* to recover due to limitation of actions and notice problems.

Consequently, the *Oscar Mayer* court construed *Peoria Belwood* to hold that the date of injury is a factual determination which varies depending on the circumstances. The court stated:

"The date of disablement, be it for reason of medical treatments such as surgery, or actual collapse of the physical structure, is but one aspect of the proof the parties may bring to bear on the issue of manifestation of the injury. Where, as here, the relationship of the injury to the employment is acknowledged by respondent, as well as the fact claimant continued to perform his duties until the day prior to the surgery required to correct the condition, the Commission could reasonably determine the last day claimant worked was the date of accident. In short, we hold the term 'fact of the injury' as used by the supreme court in *Peoria Belwood* [citation omitted] is not synonymous with 'fact of discovery.'

"We reiterate we are dealing with a repetitive-trauma injury. Nothing we say here should be interpreted as establishing an inflexible rule. Just as we reject respondent's contention the date of discovery of the condition and its relation to the employment necessarily fixes the date of accident, we reject any inter-

pretation of this opinion which would permit the employee to always establish the date of accident in a repetitive-trauma case by reference to last date of work." 176 Ill. App. 3d at 612.

Similarly, in *Three "D" Discount Store v. Indus. Comm'n*, 198 Ill. App. 3d 43, 49, 556 N.E.2d 261 (1989), the court stated, "[W]e emphasize that the peculiar facts of each case must be closely analyzed in repetitive-trauma cases to be fair to the faithful employee and his employer as well as to the employer's compensation insurance carrier."

Other states which consider carpal tunnel syndrome to be an accidental injury, not an occupational disease, have also been called upon to determine the exact date of injury. In *Jones v. Thermo King*, 461 N.W.2d 915, the Minnesota Supreme Court dated the injury from when the employee has sufficient information to put the employer on notice that the employee has a potential claim. Alternatively, the Tennessee Supreme Court held that in a case of gradual injury, such as carpal tunnel syndrome, the accidental injury is deemed to occur when the employee is no longer able to work. *Barker v. Home-Crest Corp.*, 805 S.W.2d 373. In Maine, the injury is said to occur when it "fully manifests itself." *Ross v. Oxford Paper Company*, 363 A.2d 712, 714 (Me. 1976).

In *Duvall v. ICI Americas, Inc.*, 621 N.E.2d at 1127, the Indiana Court of Appeals held that carpal tunnel syndrome "occurs" when the injury is "discernible." The court specifically rejected the employee's argument that the injury occurred when it prevented her from earning full wages. Finally, in Pennsylvania, the date of injury in carpal tunnel syndrome cases has been deemed to be the date of diagnosis. *Brooks v. W.C.A.B. (Anchor Glass)*, 155 Pa. Commw. 248, 624 A.2d 821 (1993). The *Brooks* court stated:

"While Claimant's condition continued to worsen after 1985 to the point where he was no longer able to work in 1988, this does not negate the fact that Claimant was first diagnosed as being injured in 1985 and that he could have maintained a claim, at least for medical benefits, as early as 1985." 155 Pa. Commw. at 252-53.

The inconsistency of other state decisions, combined with the lack of precedent in this state, provides us with a perplexing prob-

lem. Further complicating matters is the fact that claimant did not complain of pain in his right hand until October of 1987. According to the law of this state, where only one hand is stricken with carpal tunnel syndrome, the injury is compensated as a scheduled injury pursuant to K.S.A. 44-510d. *Downes v. IBP, Inc,* 10 Kan. App. 2d 39, 691 P.2d 41, *rev. denied* 236 Kan. 875 (1984). However, where both hands are plagued with the infirmity, the claimant is entitled to compensation under K.S.A. 44-510e as a permanent partial general disability. *Murphy v. IBP, Inc.,* 240 Kan. 141, 145, 727 P.2d 468 (1986).

Here, the Board found the date of injury to be August 27, the last day worked, and further found the injury to be a permanent partial *general* disability. However, there was no evidence that claimant's carpal tunnel syndrome was bilateral until October. Indeed, between August and October, claimant was unemployed. This fact could lead to the inference that the carpal tunnel syndrome existed in both hands at the time he was fired, as there was nothing between August and September to create the condition in his right hand. However, the basis for the Board's use of the permanent partial general disability statute is unclear.

Our analysis to this point has demonstrated the complexities in fixing the "date of injury" or "date of occurrence" in a carpal tunnel syndrome case. We hold that the claimant's date of injury as to his left wrist and as to his bilateral carpal tunnel condition will be the same—the last day he worked for respondent. This offers simplicity and establishes uniformity in the process in dealing with carpal tunnel syndrome cases. It also eliminates the problem of sorting out a scheduled injury from an injury which has caused permanent partial general disability. Since the disability is to be computed from the last day of work, we have one injury, that being a bilateral carpal tunnel injury, and only one injury on which to determine claimant's disability.

In the final analysis, whether carpal tunnel syndrome is a personal injury caused by accident or an occupational disease is nothing more than an interesting issue of semantics. We conclude that we need not decide that question. The key to resolving the issues on this appeal is to fix the date from whence compensation is to

be computed. It does not seem to us to be essential to decide whether carpal tunnel syndrome is a "personal injury caused by accident" or an "occupational disease." Our goal is to establish a bright line rule on which to fix the "date of injury" or "date of occurrence."

At this point, we pause to note that our opinion deals only with compensating a claimant for disabilities suffered as a result of carpal tunnel syndrome. It does not and should not be confused with whether the condition is job related and has nothing to do with medical reimbursements for an on-the-job injury or occupational disease.

Under our statutory scheme, disability compensation must begin at some fixed point in time. In the case of disability which is the result of a personal injury caused by accident, the date of the accident becomes the date from whence compensation flows. K.S.A. 44-510e(a)(1). In the case of an occupational disease, the injury or condition is deemed to have "occurred" on the last day worked. K.S.A. 44-5a06.

In the instant matter, both the ALJ and the Board concluded that the last day of work should be deemed as the date of occurrence, at least insofar as the bilateral carpal tunnel condition is concerned. We affirm that decision. We carry that decision one step further and conclude that the last day of work should be the date from when disability is computed in all cases involving carpal tunnel syndrome. There are other possible dates. We could select the date on which the injury first "manifested itself." We could select the date on which the injury is first "diagnosed." However, as is illustrated by the Illinois decisions in *Peoria County Bellwood* and *Oscar Mayer,* those two dates can be prejudicial to some claimants. If we were to adopt either the date on which the injury "manifests itself" or the date on which the injury is "diagnosed," we would set a potential trap for the individual who, despite pain and discomfort, continues to work long after his or her carpal tunnel is "diagnosed" or has "manifested itself." Those individuals would find their claims for compensation barred by the statute of limitations. It seems to us that we should adopt the rule that causes the least potential prejudice and upholds the spirit of our

Workers Compensation Act. We believe use of the last day of work accomplishes both of those purposes.

The fact is, carpal tunnel syndrome appears to be a hybrid condition that is neither fish nor fowl. It is a condition caused by repetitive trauma over a long period of time. While it is true that it is caused by trauma and thereby fits the definition of an "injury caused by accident," it is nonetheless a condition that defies any attempt to affix the precise date the accident occurred. For example, in this case, claimant's bilateral carpal tunnel syndrome was not diagnosed until several months after he left his job. If we were to adopt the date of "diagnosis" analysis, we would be awarding compensation to begin at a time several months after claimant left his employment. This does not seem to be a logical result. Despite that fact, if claimant's condition was caused by or related to his job with respondent, claimant is entitled to be compensated for the condition even though it neither was "diagnosed" nor "manifested itself" until several months after he left his job. We conclude that where the evidence indicates that the bilateral carpal tunnel syndrome condition was caused by claimant's work for respondent, then the date of "occurrence" or date of "injury" relates back to the last date on which claimant worked.

The same analysis is applied to the carpal tunnel syndrome that afflicted claimant's left wrist. The date of "occurrence" of this condition is also the last day of work. This is the date on which claimant's condition became so painful and debilitating that he could no longer perform his job functions. This was the date, in fact, on which he became "disabled" as a result of carpal tunnel syndrome. The selection of the last day of work as the date of occurrence or date of accident satisfies the philosophy of the Workers Compensation Act and does not offend a logical approach to the issue.

We hold that carpal tunnel syndrome is a condition that cannot logically be said to be either a personal injury caused by accident or an occupational disease. Because of the complexities of locating the date of injury in a carpal tunnel syndrome case, the process is simplified and made more certain by adopting a rule that in a carpal tunnel syndrome action, the date from which compen-

sation flows is the last date worked by the claimant. This date will not only simplify the process, it offers the least potential prejudice to future claimants. In establishing this date, we decline to label the condition. It is a condition that lies somewhere in between a personal injury caused by accident and an occupational disease. It has features of both, but best lends itself to a "last day of work" analysis as the date of injury or occurrence.

We affirm the decision entered by the Board, determining the date of injury or date of occurrence in this case to be claimant's last day of work. We also establish that date as a bright line rule to be applied in similar carpal tunnel syndrome cases in the future.

## PERMANENT PARTIAL DISABILITY

Prior to 1987, K.S.A. 44-510e (Ensley 1986) stated in part: "The extent of permanent partial general disability shall be the extent, expressed as a percentage, to which the ability of the workman to engage in work of the same type and character that he was performing at the time of his injury, has been reduced." This was known as the "physical impairment" test. Using that theory, the factfinder determined the amount of disability by examining the extent to which the injured worker's ability was impaired to engage in work of the same type and character which was being performed at the time of the injury. *Ploutz v. Ell-Kan Co.*, 9 Kan. App. 2d 9, 12, 668 P.2d 196 (1983), *aff'd* 234 Kan. 953, 676 P.2d 753 (1984). Because a worker's capacity or actual wage loss was not considered, it was possible for a worker to change job functions and earn the same wages but still receive a maximum award for disabilities because the worker could not perform work of the *same type and character* that was being performed at the time of the injury. *Antwi v. C-E Industrial Group*, 5 Kan. App. 2d 53, 60-61, 612 P.2d 656, *aff'd* 228 Kan. 692, 619 P.2d 812 (1980).

In July of 1987, 44-510e was amended to read in part:

*"The extent of permanent partial general disability shall be the extent, expressed as a percentage, to which the ability of the employee to perform work in the open labor market and to earn comparable wages has been reduced,* taking into consideration the employee's education, training, experience and capacity for rehabilitation, except that in any event the extent of permanent partial general

disability shall not be less than the percentage of functional impairment. Functional impairment means the extent, expressed as a percentage, of the loss of a portion of the total physiological capabilities of the human body as established by competent medical evidence. There shall be a presumption that the employee has no work disability if the employee engages in any work for wages comparable to the average gross weekly wage that the employee was earning at the time of the injury." (Emphasis added.)

Although not relevant to this appeal, we note that the provision has since been amended. Currently, the method of calculating disabilities for a permanent partial general disability is figured by determining the extent to which the employee has lost the ability to perform his or her prior work, *averaged together* with the difference between the income earned at his or her prior position and the income earned after the accident. The extent to which the employee has lost the ability to perform his or her work is to be determined using physician testimony. Thus, it appears the legislature has combined the pre-1987 and post-1987 law on this issue. K.S.A. 44-510e(a).

As we understand the record, under any theory, claimant's date of bilateral injury must be fixed some time later than July 1987. Utilizing the 1987 amended version of the statute, the Board found that claimant failed to prove an inability to perform in the open labor market but did show an inability to earn comparable wages in the amount of 10%.

With respect to loss of access to the open labor market, the Board found claimant failed to sustain his burden of proof. "Absent arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion or prejudice [a negative finding by the trier of fact] cannot be disturbed" on appeal. *Mohr v. State Bank of Stanley*, 244 Kan. 555, 567-68, 770 P.2d 466 (1989). There is no evidence the Board's decision was based upon passion or prejudice or that the Board arbitrarily disregarded undisputed evidence. Thus, assuming the proper statute was applied, the Board's finding regarding loss of access to the open labor market is affirmed.

However, the Board's finding that claimant only proved a 10% loss of wage earning capacity is not supported by the record. After

discontinuing work as a sheet metal worker, respondent offered claimant a position in the small parts division for a 10% decrease in pay, which claimant refused. The Board found that claimant had shown a 10% loss of wage earning capacity because such was the disparity between the income of these two positions. The Board did not incorporate the income of the job claimant actually accepted with Smith Fiberglass, which paid $7.00 per hour (a 39% decrease). Claimant testified that he refused the Boeing job in the small parts division because at that position he would have had to work 12 hours a day, 7 days a week. Although an 84-hour work week seems highly unlikely, this evidence was uncontradicted and must be assumed to be true. Why the Board chose to use the salary of a job the claimant was unable to perform (due to the exceptional amount of hours), rather than the salary of the position that claimant actually procured, is unclear. On remand, the factfinder should either include the Smith Fiberglass salary in its formulation of claimant's loss of wage earning capacity or provide a sufficient basis for omitting the same in its computation.

We conclude that the Board improperly determined claimant's loss of wage earning capacity under the facts of this case.

Affirmed in part, reversed in part, and remanded for further proceedings.