No. 80,830

SHIRLEY TREASTER, *Claimant/Appellant,* v. DILLON COMPANIES, INC., *Respondent/Appellee,* and WORKERS COMPENSATION FUND, *Insurance Carrier/Appellee.*

(987 P.2d 325)

Opinion filed July 9, 1999.

*Andrew L. Oswald,* of Hutchinson, argued the cause and was on the brief for appellant.

*Scott J. Mann,* of Gilliland & Hayes, P.A., of Hutchinson, argued the cause, and *E. Thomas Pyle, III,* of the same firm, was with him on the brief for appellee Dillon Companies, Inc.

*David Shriver*, of Shriver & Embers, L.L.C., of McPherson, was on the brief for appellee Workers Compensation Fund.

The opinion of the court was delivered by

LARSON, J.: Shirley Treaster (claimant) appeals the decision of the Workers Compensation Board (Board) that determined (1) August 2, 1993, was the date of the accident or occurrence, and (2) Dillon Companies, Inc., (respondent) was entitled, pursuant to K.S.A. 44-501(h), to offset the workers compensation award by retirement benefits claimant was receiving from a plan totally funded by respondent's contributions.

Although their legal effect is in issue, the facts are not substantially contested and are as follows.

Claimant began her employment with respondent's shipping division of its bakery warehouse in 1968. By 1990, claimant was experiencing problems with her left foot. From early 1990 through May 1991, claimant was treated by various medical practitioners, including a podiatrist, a chiropractor, and orthopedic specialists.

Claimant had suffered from a repetitive use injury to her right thumb and elbow in late 1992 and had been off work from January 6, 1993, until April 5, 1993, as a result of surgery. When she returned to work, her regular duties were restricted to a 4-hour day.

After returning to work, claimant experienced additional pain in both feet and sought medical treatment from Dr. Bradley W. Bruner, whom she first saw on May 10, 1993. Dr. Bruner prescribed arch supports for her shoes and told her the injury to her feet was work-related. He recommended that claimant continue working the 4-hour schedule she was then observing. Claimant filed a workers compensation claim for injuries to her "bilateral lower extremities" the following day, May 11, 1993.

By June 20, 1993, claimant's upper right extremity problems had resolved and she was released to work on a full-time basis. However, after working one 8-hour day, claimant's bilateral foot symptoms increased to the point she returned to Dr. Bruner for additional treatment. He restricted her to performing her regular duties 4 hours per day and referred her to Dr. Steven Howell, an orthopedic surgeon who specializes in foot and ankle surgery.

Claimant continued to work 4 hours per day in her regular employment until August 3, 1993, when Dr. Howell diagnosed her as suffering from "overload pain" in both feet. He casted both of her feet in an effort to reduce the structural stress and released her from the work restrictions imposed by Dr. Bruner. When claimant attempted to return to work on August 6, 1993, respondent did not want claimant to work wearing casts.

Claimant was off work from August 3, 1993, until November 22, 1993, when she was fitted with braces and returned to work in an accommodated position, which allowed her to sit rather than stand throughout her working day. Claimant performed the accommodated work until May 28, 1994, when the accommodated position could no longer be provided because of pressure imposed on respondent by claimant's union.

The union demanded that respondent formalize the position claimant was working and put it up for bid. Because claimant was not the most senior employee, bidding would have meant that she would have lost the position, which was eliminated by respondent.

Claimant had initiated discussions earlier with respondent and her union regarding qualification for retirement. Under the union's retirement program, that was fully funded by respondent, claimant would qualify for "Golden 80" retirement benefits when the sum of her age and years of service equaled 80. Claimant turned 55 on December 18, 1994, and with 25 years of employment with respondent, this entitled her to retirement benefits and continuation of health insurance. Claimant retired January 1, 1995, although she did not work after May 28, 1994, with the remaining portion of the year being characterized as her being disabled in order for claimant to qualify for retirement benefits of $1,250 per month.

The nature and extent of the disability and the equal apportionment of the liability for the award between respondent and the Workers Compensation Fund is not an issue on appeal. We will confine our factual discussion only to the two appellate issues.

Claimant continued to be treated by Dr. Howell through April 1994. It was his opinion that "if appropriate braces are made for claimant, it would adequately allow her to potentially return to gainful employment or at least to be able to perform activities of

daily living without chronic foot pain." Dr. Howell's testimony was that claimant's injuries to her feet were "slowly accumulating" and increased in severity up through and including the time he undertook her care on August 3, 1993. The preexisting condition of claimant's feet combined with her specific work duties stressed her arches. According to Dr. Howell, based on claimant's history, "she's having overuse pain in her feet, that basically she's hurting her feet an iota more than her foot can heal itself in a typical day."

In May 1995, claimant was examined by Dr. Philip Mills, a Wichita area podiatrist who diagnosed "overuse syndrome," imposed restrictions of avoiding standing and walking more than 1 to 2 hours, and concluded claimant's injury had occurred before May 1993. Dr. Mills initially stated he had insufficient information upon which to base an opinion to a degree of medical certainty as to whether claimant suffered additional injuries subsequent to May 10, 1993, but when later deposed, and after reviewing claimant's testimony, he concluded that if claimant's subjective reports of pain had increased after May 10, 1993, she probably would have been suffering additional accidental injury each and every working day up through her last day worked at regular duties of August 2, 1993.

Administrative Law Judge (ALJ) Bruce E. Moore compared *Berry v. Boeing Military Airplanes*, 20 Kan. App. 2d 220, 223, 885 P.2d 1261 (1994), and *Condon v. Boeing Co.*, 21 Kan. App. 2d 580, 903 P.2d 775 (1995), as establishing a bright line rule upon which to fix the date of injury or date of accident. Under *Berry*, the date will be the last day worked. Under *Condon*, the exception to this general rule is, when the worker is laid off from work in a general layoff and not because of a medical condition, the date of injury is not always the last day the worker worked.

The ALJ analyzed the testimony of claimant that her pain was increasing as the reason for the May 10, 1993, appointment with Dr. Bruner. The ALJ found her testimony that her pain had plateaued a year earlier to lack credibility. The ALJ looked to Dr. Howell's testimony that claimant's condition was "getting worse and worse" at the time he saw her on August 3, 1993, and found objectively that there had been a deterioration in the condition of her feet and an increase in her subjective complaints prior to Au-

gust 3, 1993. The ALJ further found the record clearly showed that claimant was forced to terminate the work she had been performing for the preceding 25 years on or about August 2, 1993, because of the pain and disability resulting from her injury. August 2, 1993, the last day claimant was lifting and stacking trays of bread in the shipping department of respondent's bakery, represented her last injurious exposure to repetitive micro-traumas and the appropriate day for injury for the purpose of her claim.

As to the other issue on appeal relating to the reduction of benefits by retirement payments from a plan provided by the employer under K.S.A. 44-501(h), the ALJ did not find claimant's arguments persuasive. He found the fund was totally contributed to by the respondent, that a constitutional argument of equal protection would have to be considered by appellate courts, and the retirement benefits offset was properly established.

All parties requested a review by the appeals board which unanimously affirmed the ALJ on the issue of the date of the accident and the application of the K.S.A. 44-501(h) offset.

In finding that August 2, 1993, was the last day claimant performed her regular job duties and, therefore, the day claimant sustained the repetitive micro-traumas to her feet, the Board looked to the medical testimony and stated such conclusion is supported by Dr. Howell. He testified as to multiple overuse of the feet and specifically stated:

"Q. And does that condition or at least as described to you, did that condition continue to get worse with each and every day of work?

. . . .

"A. I think so. You know, there was no one specific time that Shirley had no pain and then suddenly fell and had a foot crushed and that caused the pain. It was a slowly increasing problem that had been going on. And I should mention it started, according to Shirley's history, in approximately 1987, and depending on how much time she is on her feet and the activities depended on how severe her symptoms were. And so, obviously, if there's no one incident, it's a slowly accumulating injury that is —

"Q. And I guess to take it one step further, she advised you that she associated it with her job of being on her feet all day climbing up stacks of food products, correct?

"A. Yes.

"Q. And from a general sense, as long as she's performing that job, whether that be four hours out of a day or eight hours a day, that's the activity that was causing injury to her feet, correct?

"A. Correct.

. . . .

"Q. (By Mr. Mann) Assume with me that I'm talking about when she was working four hours a day performing the job as you described it, climbing up stacks and being on a concrete floor four hours out of the day.

"A. I can say this much, when a person presents with Shirley's clinical drawing on the form, her history and her physical exam, it tells me she's having overuse pain in her feet, that basically she's hurting her feet an iota more than her foot can heal itself in a typical day. That activity that's causing that is essentially everything that she does on her feet, but certainly the activity of climbing up the racks, as she described it, does tend to stress one's arch substantially. And I think it's somewhat speculative to say that activity alone did it, but her activity was more than her feet could tolerate in a particular day with the amount of foot support she was in at that time."

The Board found the work activity which caused the micro-traumas and permanent injuries to claimant's feet continued through August 2, 1993, and ceased, which is, therefore, the most appropriate date of accident under the guidelines set forth in *Berry* and *Condon*.

The Board specifically found that because claimant's accidental injury occurred after July 1, 1993, respondent is entitled to reduce claimant's permanent partial general disability benefits by $1,250 per month, citing K.S.A. 44-501(h). The Board stated it did not have authority to strike down a statute for being unconstitutional and did not address claimant's unconstitutional arguments regarding K.S.A. 44-501(h). The Board did state that "[t]he Kansas Supreme Court found that statute constitutional in *Injured Workers of Kansas v. Franklin*, 262 Kan. 840, 942 P.2d 591 (1997).

From the award and decision of the Board, claimant has appealed, raising the two issues first stated.

K.S.A. 44-556 specifically subjects appeals from the Workers Compensation Board to be subject to the provisions of the Kansas Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA), K.S.A. 77-601 *et seq.*

The KJRA limits relief as provided by K.S.A. 77-621(c)(4), (7), and (8), which state:

"The court shall grant relief only if it determines any one or more of the following:

. . . .

"(4) the agency has erroneously interpreted or applied the law;

. . . .

"(7) the agency action is based on a determination of fact, made or implied by the agency, that is not supported by evidence that is substantial when viewed in light of the record as a whole, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this act; or

"(8) the agency action is otherwise unreasonable, arbitrary or capricious."

The 1993 Workers Compensation Act limits review of all orders issued after October 1, 1993, to questions of law. K.S.A. 44-556(a). But, the determination on appeal of whether the Board's findings of fact are supported by substantial competent evidence is a question of law. *Tovar v. IBP, Inc.,* 15 Kan. App. 2d 782, 784, 817 P.2d 212, *rev. denied* 249 Kan. 778 (1991).

The issue critical to the arguments of the claimant and respondent is whether the date of accident or occurrence is determined to be prior to or after July 1, 1993. It is claimant's contention the date of occurrence is June 24, 1993, the date Dr. Bruner restricted the number of hours she could perform her regular duties. If this date is selected, claimant is not subject to the retirement benefits offset of K.S.A. 44-501(h). Respondent argues the ALJ and Board correctly determined the date of occurrence to be August 2, 1993, which was the last day claimant performed her regular job duties. The parties' contentions are based on their view of five recent Court of Appeals cases, none of which have been reviewed by our court.

The most significant of these cases is the first, *Berry v. Boeing Military Airplanes,* 20 Kan. App. 2d 220, where the repetitive trauma that caused carpal tunnel syndrome was deemed to have features of both a personal injury caused by accident and an occupational disease with, the date of accident held to be the last day on which a claimant performs services for his or her employer and is required to stop working as a direct result of the claimant's pain and disability.

The analysis of *Berry* pointed out that if carpal tunnel syndrome is caused by an accident, it took place on the date of the injury,

K.S.A. 44-510e(a), but if it is linked to an occupational disease, the injury is deemed to have occurred on the last day worked. K.S.A. 44-5a06. *Berry* looked to the definition of accident in K.S.A. 44-508(d) and that of an occupational disease in K.S.A. 44-5a01(b).

With the decisions in other states being inconsistent, *Berry* referred us to Professor Larson, who set forth the two alternative criteria to determine the date of accident where the injuries are repetitive and gradual. Those criteria are (1) the time at which an employee can no longer perform his or her job and (2) the time of the onset of the employee's pain which necessitates medical attention. 1B Larson, The Law of Workman's Compensation § 39.50. 20 Kan. App. 2d at 224. A third method—when the employee becomes aware of the injury and its relation to the job—had been used by Illinois in *Peoria County Belwood v. Ind. Com.*, 115 Ill. 2d 524, 505 N.E.2d 1026 (1987). The court later acknowledged this rule was unfair to an employee who continues to work notwithstanding his or her progressive ill-being, resulting in a claim being submitted before he or she was actually disabled or if the employee waited, he or she would be precluded from any recovery due to a limitation of actions or notice problems. See *Oscar Mayer & Co. v. Industrial Comm'n*, 176 Ill. App. 3d 607, 531 N.E.2d 174 (1988).

With this background of the problem, we set forth the facts the Court of Appeals was considering in the *Berry* case.

Berry injured his finger on May 12, 1987, and filed a claim on May 19, 1987. He was diagnosed with carpal tunnel syndrome in his left wrist on June 2, 1987, which resulted in his transfer to a different position—one more accommodating to his injury. The new position was at a lower pay scale but was accepted by the employee until he learned a large amount of overtime was required. Unwilling to work additional time resulted in Berry's employment with Boeing being terminated on August 27, 1987.

Near the end of September 1987, Berry had surgery on his left wrist which helped, but pain was experienced in the right hand for which Berry had surgery in November 1987. On July 11, 1988, a claim for compensation was filed. Berry subsequently had surgery on both hands in early 1992.

When the ALJ and Board held the date of accident was the last day Berry worked for Boeing, he appealed, contending his date of accident occurred prior to July 1987, making evidence of loss of access to the open labor market and loss of ability to earn a comparable wage inapplicable.

This is the same kind of reason for the argument we have in the case before us except our date is July 1, 1993, and the issue is whether the retirement benefits offset of K.S.A. 44-501(h) is to be applied.

In affirming the decision of the ALJ and Board that the last day of work should be deemed the date of occurrence, at least insofar as the bilateral carpal tunnel condition is concerned, the Court of Appeals' per curiam *Berry* opinion went on to state:

"We carry that decision one step further and conclude that the last day of work should be the date from when disability is computed in all cases involving carpal tunnel syndrome. There are other possible dates. We could select the date on which the injury first 'manifested itself.' We could select the date on which the injury is first 'diagnosed.' However, as is illustrated by the Illinois decisions in *Peoria County Belwood* and *Oscar Mayer*, those two dates can be prejudicial to some claimants. If we were to adopt either the date on which the injury 'manifests itself' or the date on which the injury is 'diagnosed,' we would set a potential trap for the individual who, despite pain and discomfort, continues to work long after his or her carpal tunnel is 'diagnosed' or has 'manifested itself.' Those individuals would find their claims for compensation barred by the statute of limitations. It seems to us that we should adopt the rule that causes the least potential prejudice and upholds the spirit of our Workers Compensation Act. We believe use of the last day of work accomplishes both of those purposes.

. . . .

"We hold that carpal tunnel syndrome is a condition that cannot logically be said to be either a personal injury caused by accident or an occupational disease. Because of the complexities of locating the date of injury in a carpal tunnel syndrome case, the process is simplified and made more certain by adopting a rule that in a carpal tunnel syndrome action, the date from which compensation flows is the last date worked by the claimant. This date will not only simplify the process, it offers the least potential prejudice to future claimants. In establishing this date, we decline to label the condition. It is a condition that lies somewhere in between a personal injury caused by accident and an occupational disease. It has features of both, but best lends itself to a 'last day of work' analysis as the date of injury or occurrence.

". . . We also establish that date as a bright line rule to be applied in similar carpal tunnel syndrome cases in the future." 20 Kan. App. 2d at 228-30.

The bright line rule of *Berry* was immediately blurred by the result of the next decision of the Court of Appeals where an exception to the *Berry* rule was found to exist where the worker who suffered from work injuries caused by micro-traumas was laid off from work in a general layoff. Because the cessation of employment was not due to a medical condition, the date of injury was held to not always be the last day of work. *Condon v. Boeing Co.,* 21 Kan. App. 2d 580. This retreat from *Berry's* bright line rule appears to be largely fact driven, as the opinion holds there was substantial competent evidence to uphold the Board's decision that restrictions placed on Condon had occurred by June 15, 1993, and work subsequent to July 1 would not have significantly contributed to her condition when she was laid off for reasons not related to her medical condition on July 6, 1993.

The facts behind this ruling are set forth in the *Condon* opinion as follows:

"Glenda Condon, claimant, was hired by Boeing in 1987 as a clerk typist. In January 1993, Boeing transferred Condon to a position which required her to do data input for much longer periods of time during her work day. Sometime in May 1993, she developed pain in her wrist, arm, and elbow. Condon reported to Boeing's medical office and was initially diagnosed as having carpal tunnel syndrome.

"On June 7, 1993, Condon was seen by Dr. Lesko, an orthopedic surgeon, who initiated some restrictions and recommended therapy. Lesko believed Condon suffered from a median nerve compression, some ulnar nerve irritation, and possible carpal tunnel syndrome or a dorsal cyst. About June 15, 1993, Condon noticed pain in her shoulders, neck, and left side. Condon again contacted Boeing's medical office, which again referred her to Dr. Lesko. After doing some tests, Lesko still could not specifically identify the cause of Condon's pain.

"Condon continued working at Boeing until July 6, 1993, when she was laid off. The parties agree that Condon's layoff was not related to her medical condition." 21 Kan. App. 2d at 581.

The ALJ set the date of injury as the last day worked and applied the 1993 amendments, but the Board found for computational purposes, Condon's injury occurred June 15, 1993, and used this date because that was the date Condon informed Dr. Lesko of her shoulder problems. The *Condon* opinion does not state that any

change in her condition occurred during the few days she worked in July 1993.

After recognizing *Berry*, the *Condon* opinion upheld the Board's decision by stating: "The ultimate issue on appeal is whether the Board's findings are supported by substantial competent evidence. Findings in a workers compensation case which are supported by substantial competent evidence will be upheld." 21 Kan. App. 2d at 587. With the Board's decision being upheld only because it was supported by substantial competent evidence, *Condon* should be limited to its facts and not used to erode *Berry's* authority.

The Court of Appeals next decided *Durham v. Cessna Aircraft Co.*, 24 Kan. App. 2d 334, 948 P.2d 8 (1997), which followed *Berry* and held the date of the accident from which compensation flows was the last day worked by the claimant where the cessation of work was due to a repetitive use type of injury.

The date of injury was important here because if set prior to July 1, 1993, it was a general body disability while if under the law subsequent to July 1, 1993, it would be a scheduled injury to the upper left extremity.

The record showed claimant began to suffer symptoms in October 1992, but despite his condition becoming progressively more disabling, lost no work from the injury until July 22, 1993, when he was forced to quit work temporarily in order to have surgery on his shoulder.

The Board looked to *Berry* and *Condon* and found the date of the accident was the last date worked by Durham prior to his surgery, not when he first saw a doctor or a surgeon. The *Durham* opinion held that *Berry* controls and stated: "*Condon* expanded the *Berry* rule to apply to microtraumas, other than carpal tunnel, caused by repetitive activity." 24 Kan. App. 2d at 336.

A new fact scenario was introduced into this line of cases in *Alberty v. Excel Corp.*, 24 Kan. App. 2d 678, 951 P.2d 967 (1998), where it was held that if the claimant suffered from upper extremity tendinitis and bilateral carpal tunnel syndrome, yet continued to work in an accommodated position, the date of injury was the last day of work before restrictions were implemented. This holding was believed to follow *Condon* because it was a situation where

the claimant's carpal tunnel syndrome had not necessitated that she leave her employment with Excel.

The amount of the award was not in dispute but rather the rapidity over which it was to be paid out was the central issue.

The facts of *Alberty* are involved but necessary to repeat in detail in our analysis of these cases.

Alberty commenced employment in January 1988 as a whizzard knife operator in Excel's slaughter house. By 1989, she began experiencing pain and cramping in her hands. She began treatment with Dr. Trotter for a lump on her right thumb on January 23, 1992. She was treated conservatively with anti-inflammatory medication and felt the thumb pain had been resolved.

By March 31, 1992, Alberty had returned to Dr. Trotter with complaints of pain in both hands and wrists. She was treated for tendinitis and placed on light duty, with work restrictions against use of hooks, knives, and vibrating tools. Excel transferred her to quality assurance in packoff.

Alberty was referred to Dr. Garcia, an orthopedic surgeon in October 1992. He diagnosed carpal tunnel syndrome and recommended surgery which she did not have.

Alberty began treatment with Dr. Melhorn, an orthopedic hand specialist in January 1993. He implemented conservative treatment and injected her right shoulder with steroids and continued her work restrictions.

Alberty filed an application for a hearing on March 3, 1993, contending that on January 23, 1992, and every working day thereafter she suffered injuries to both shoulders, arms, elbows, wrists, and hands.

Alberty was on maternity leave in the summer of 1993, but was placed on light duty status when she returned to work. Dr. Melhorn released her to return to her position in quality assurance in mid-November 1993, because she was at maximum medical improvement. When asked for a rating on February 1, 1994, Dr. Melhorn noted she was doing her regular work in quality assurance and has task rotation as part of her work environment. She was placed on light duty through February 1994. The record reflected Alberty

had continued to work every working day except during her maternity leave.

The ALJ determined the date of accident was January 23, 1992, the date Dr. Trotter had put Alberty on work restrictions. The Board disagreed and held February 19, 1994, the last day Alberty worked on light duty before accepting a permanent accommodated position in packoff, was the proper date of the accident for compensation purposes.

The *Alberty* opinion summarized *Berry* as a holding requiring the last day the claimant worked before his or her condition necessitated withdrawal from work as the accident date in carpal tunnel cases. *Condon* was deemed to hold that when a worker suffering from micro-traumas is subject to a layoff not because of a medical condition, and any subsequent work would not have significantly contributed to claimant's condition, the date of injury is the date the claimant's physician first ordered work restrictions.

The *Alberty* facts were stated to be similar to those in *Condon* because there had been no necessity for claimant to leave her employment with Excel. The Court of Appeals reversed the Board, stating its holding was inconsistent with *Condon* but held there was no substantial competent evidence to support January 23, 1992, as the date Dr. Trotter first put Alberty on work restrictions. Rather, he did so on March 31, 1992, when she was limited to no work with hooks, knives, and vibrating tools. The *Alberty* opinion stated:

"Under *Condon*, the date of accident in a repetitive trauma case is the last day of work before work restrictions are implemented. Therefore, this court finds that March 31, 1992, is the date of Alberty's accident.

"It should be noted, however, that if Alberty's medical condition had caused her to quit working, the *Berry* holding would have been applicable, and the date of her accident would have been her last day of work." 24 Kan. App. 2d at 683.

The confusion began by *Condon* is amplified by *Alberty*. The certainty desired by *Berry* is now questionable.

Respondent argues we should distinguish *Alberty* factually because the claimant there did not miss any work as the result of her repetitive use injuries, while our facts showed Treaster missed work from August 3 to November 22, 1993. This is claimed to be sufficient to uphold the Board because the *Alberty* opinion stated that

if Alberty's medical condition had caused her to quit working, then the *Berry* holding would apply and the date of accident would be the last day of work. Respondent argues this compels a finding that August 2, 1993, was Treaster's last day of work and the date of the accident or occurrence for compensation purposes.

*Alberty* is distinguishable factually as respondent suggests, but it is also necessary that we disapprove of *Alberty's* language that "the date of accident in a repetitive trauma case is the last day of work before work restrictions are implemented." If this is the rule and a worker works for a long period with the restrictions and without making a claim, the claimant would lose valuable rights and the problems *Berry* sought to solve still exist. We do not limit *Berry* to only situations where the claimant could no longer continue his or her employment because of medical conditions. The expected result of *Berry* was for workers to be allowed the latest possible date for their claim period to begin, not for claimants and respondents to try to pick a date of accident or occurrence that best serves their financial purposes.

The last of the Court of Appeals cases on this issue requires little discussion. In *Anderson v. Boeing Co.*, 25 Kan. App. 2d 220, 960 P.2d 768 (1998), the *Berry* rule was applied in a contest between two insurance companies who had provided coverage to Boeing over different periods. *Anderson* held the date of the accident or occurrence is the last day the claimant performs services for his or her employer and is required to stop working as a direct result of his or her pain and disability resulting from carpal tunnel syndrome.

An attempt to change *Berry's* bright line rule by applying *Condon* was rejected with our Court of Appeals stating:

"*Condon* is simply not controlling on the facts shown. That case involved a microtrauma situation where the last day of work was the result of a general layoff. In this case, claimant was required to quit his job on August 31, 1995, due to his bilateral carpal tunnel syndrome and on the advice of his physician. *Berry* requires that the last day of work be applied in a case of this nature, and the Board did not err in doing so." 25 Kan. App. 2d at 222.

When we analyze these five decisions we approve the logic, reasoning, and result of *Berry, Durham,* and *Anderson.* We do not

limit *Berry's* holding only to situations where the claimant is forced to discontinue his or her employment for medical reasons. If an accommodated position is offered and accepted that is not substantially the same as the previous position that claimant occupied, the *Berry* rule should be applied. The date of accident or occurrence will be the last day the claimant performed the earlier work tasks. This rule disregards attempts by either claimants or respondents to move a date of accident or occurrence to before or after an advantageous time for purely monetary or coverage reasons.

To the extent we have stated herein, the logic and results of *Condon* and *Alberty* are disapproved.

When we apply the *Berry* rule and discount the *Condon* and *Alberty* decisions as we have discussed, the result reached by the ALJ and Board in the case before us is clearly correct. Claimant was forced to discontinue the work she had performed for respondent in the shipping department of the bakery because of her pain and disability resulting from the overuse syndrome in her feet. The medical evidence of both Dr. Howell and Dr. Mills substantiates that claimant was "hurting her feet an iota more than her foot can heal itself in a typical day," as Dr. Howell specifically stated.

August 2, 1993, was the last day that claimant worked at the job that had been the cause of her injuries. It is the appropriate date of injury or occurrence for the purposes of her claim, and the Board's ruling on this issue is affirmed.

Claimant also contends the Board erred in holding respondent was entitled to offset the workers compensation award by retirement benefits claimant was receiving as required by K.S.A. 44-501(h).

K.S.A. 44-501(h) was enacted by the 1993 Kansas Legislature and became effective July 1, 1993. It states:

"If the employee is receiving retirement benefits under the federal social security act or retirement benefits from any other retirement system, program or plan which is provided by the employer against which the claim is being made, any compensation benefit payments which the employee is eligible to receive under the workers compensation act for such claim shall be reduced by the weekly equivalent amount of the total amount of all such retirement benefits, less any portion of any such retirement benefit, other than retirement benefits under the federal social security act, that is attributable to payments or contributions made

by the employee, but in no event shall the workers compensation benefit be less than the workers compensation benefit payable for the employee's percentage of functional impairment."

Claimant argues respondent is not entitled to offset the award because respondent did not actually "provide" the retirement benefits as the statute requires. Claimant contends that she, not her employer, actually contributed a part of what would otherwise be her wages to the plan and, further, that she contributed to the plan through her participation in union negotiations, picketing, support, etc., long before the statute was enacted.

We do not find any of these arguments persuasive.

Similar arguments were made that "all private pension plans are actually paid for by employees through years of labor" in *Injured Workers of Kansas v. Franklin*, 262 Kan. 840, 871-72, 942 P.2d 591 (1997), which was the basis for an argument that K.S.A. 44-501(h), violated the Equal Protection Clause. In our holding in *Franklin* we stated:

"We hold the legislature intended to prevent duplication of wage loss replacement with the offset provision. The legislature concluded that it did not make sense to prevent duplication of replacement wages from social security benefits that were partially employer funded and not prevent such duplication of wages from employer-funded private pensions. Thus, the legislature allowed employer contributions in private pension plans, paid to retired injured workers, to offset employer-funded workers compensation benefits paid to the same injured workers, so as to prevent duplication of wage loss replacement. This is a public policy issue. The legislature believes such an offset will encourage employers to furnish retirement plans for employees because the employer will not be required to duplicate wage replacement should an injured worker retire. The prevention of wage loss duplication is a legitimate state goal, and the offset provisions for employee-funded retirement plans (social security or private pensions) are rationally related to this goal. K.S.A. 44-501(h) does not violate equal protection." 262 Kan. at 872.

Although our *Franklin* opinion did not expressly state that employee labor is not equivalent to an employee contribution under the statute, such is implied in our opinion. The statute clearly states that the employee is entitled to offset the contribution made to the pension plan, and under the undisputed facts in this case, no contribution was made by the employee.

The record reflects that "Dillons/respondent/self-insured contributed 100% of the monies to the Bakery and Confectionery Union and Industry International Pension Fund." Claimant testified before the ALJ that respondent made all of the contributions to the retirement plan.

K.S.A. 44-501(h) is constitutional. It was properly applied in this case, and the offset was correctly utilized. Claimant's arguments on this issue are without merit.

Affirmed.