(2 P.3d 175)

No. 81,230

BRIDGET C. COZAD, *Claimant*, v. BOEING MILITARY AIRPLANE COMPANY, *Respondent/Appellee*, and AETNA CASUALTY & SURETY, *Insurance Carrier/Appellee*, and KANSAS WORKERS COMPENSATION FUND, *Appellant.*

Opinion filed March 17, 2000.

*Orvel Mason*, of Law Offices of Orvel Mason, P.A., of Arkansas City, for the appellant.

*Vaughn Burkholder* and *Stephen M. Kerwick*, of Foulston & Siefkin, L.L.P. of Wichita, for the appellees.

Before PIERRON, P.M., BARRY A. BENNINGTON, District Judge, assigned, and PHILIP L. SIEVE, District Judge, assigned.

BENNINGTON, J.: The Workers Compensation Fund (Fund) appeals from an order of the Workers Compensation Board (Board) apportioning liability for Bridget C. Cozad's disability from bilateral carpal tunnel syndrome.

The facts in this case are for the most part undisputed. Cozad started working for Boeing Military Airplane Company (Boeing) in early 1985 as a sheet metal assembler. On April 28, 1992, she reported to Boeing's Central Medical unit with complaints of numb-

ness and tingling in both her hands. The symptoms had developed a month earlier. Boeing referred Cozad to Dr. Harry Morris, an orthopedic surgeon specializing in upper extremity problems, who she saw on May 12, 1992. Dr. Morris diagnosed Cozad's condition as bilateral carpal tunnel syndrome secondary to tenosynovitis and inflammation of the tendons, as well as lateral epicondylitis. Dr. Morris' diagnosis was confirmed by Dr. Lawrence Blaty on May 22, 1992.

During the time from May 12, 1992, through December 1992, Dr. Morris treated Cozad with medication, physical therapy, time off from work, and braces or splints for her wrists. Cozad was completely off work from May 12, 1992, through June 23, 1992. During that time period, Cozad's symptoms lessened, and on June 23, 1992, Dr. Morris permitted Cozad to return to work but restricted her from riveting and limited her drilling activities to 4 hours daily.

Cozad returned to work with job modifications allowing her to work within Dr. Morris' restrictions. She was limited to 4 hours of drilling per day and no riveting, and to sorting and cleaning small parts. Cozad also was given a clerical position which included charting the use of ketone, monitoring the visibility boards in the building, and taking care of the paperwork for the health and safety department. When Cozad was not cleaning parts, she was doing clerical jobs.

About a month after returning to restricted work, Cozad noticed an increase of pain and numbness in her fingers. On August 16, 1992, her hands were totally numb, white, and swollen. Cozad continued to work and her condition worsened until she was taken off work in December 1992. She underwent carpal tunnel release surgery on both wrists. Cozad never again worked for Boeing. When she was given a final release from care in July 1993, Boeing declined to provide her an accommodated position within her work restrictions. Boeing settled with Cozad based on an agreed lump sum payment of $50,000, for an approximate 40% general permanent partial bodily disability. Boeing reserved its rights against the Fund.

The only issue for the administrative law judge (ALJ) to resolve was the liability of the Fund. The ALJ found Boeing had met its

burden of proving it had retained a handicapped employee and that 8.5% of the 40% permanent partial disability existed at the time she first reported her symptoms in April/May 1992. The ALJ found Boeing was responsible for this 8.5% of Cozad's functional impairment and the Fund was responsible for all other medical benefits and expenses awarded after June 23, 1992, including temporary total disability payments, all vocational rehabilitation costs, the surgeries and related medical treatment, and the remaining 31.5% of the 40% permanent partial disability.

The Board agreed with the ALJ and found that when Cozad returned to work in June 1992, she was a handicapped employee. The Board found Cozad suffered two accidental injuries: the first a series of injuries ending on March 12, 1992; and the second on June 23, 1992, as a result of her continued work activities. The Board found the second injury would not have occurred but for the first and therefore the Fund was liable for all benefits due resulting from the second accident.

K.S.A. 44-556(a) specifically subjects workers compensation appeals to the Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601 *et seq.* The Act limits the relief granted on appeal to just a few issues, including the agency's erroneous interpretation of law and findings of fact not supported by substantial evidence when viewed in light of the record as a whole. K.S.A. 77-621(c)(4) & (7). The 1993 workers compensation amendments limited review of all orders after October 1, 1993, to questions of law. K.S.A. 44-556(a). Whether the Board's findings of fact are supported by substantial competent evidence is a question of law. *Tovar v. IBP, Inc.,* 15 Kan. App. 2d 782, 784, 817 P.2d 212, *rev. denied* 249 Kan. 778 (1991).

The issue presented is at what point in a case of bilateral carpal tunnel syndrome does the Fund become liable for apportionment of the liability between the employer and the Fund. Although this appears to be an issue of first impression, the Kansas Supreme Court in *Treaster v. Dillon Companies, Inc.,* 267 Kan. 610, 987 P.2d 325 (1999), has touched on the issue and provided a framework for resolution of the problem.

In *Treaster*, the court dealt with a repetitive use injury to the employee's foot. The court was called upon to determine the date of the accident or occurrence in order to determine whether the respondent was entitled, pursuant to the 1993 amendments in K.S.A. 44-501(h), to offset the workers compensation award by the amount of retirement benefits the claimant was receiving from a plan totally funded by the respondent. The *Treaster* court extensively discussed the bright line rule set forth in *Berry v. Boeing Military Airplanes*, 20 Kan. App. 2d 220, 885 P.2d 1261 (1994), and its progeny to set forth the following clarifications:

"Because of the complexities of determining the date of injury in a repetitive use injury, a carpal tunnel syndrome, or a micro-trauma case that is the direct result of a claimant's continued pain and suffering, the process is simplified and made more certain if the date from which compensation flows is the last date that a claimant performs services or work for his or her employer or is unable to continue a particular job and moves to an accommodated position."

"Where an accommodated position is offered and accepted that is not substantially the same as the previous position the claimant occupied, the date of accident or occurrence in a repetitive use injury, a carpal tunnel syndrome, or a micro-trauma case is the last day the claimant performed the earlier work tasks." *Treaster*, 267 Kan. 610, Syl. ¶¶ 3, 4.

The *Treaster* court reasoned: "This rule disregards attempts by either claimants or respondents to move a date of accident or occurrence to before or after an advantageous time for purely monetary or coverage reasons." 267 Kan. at 624.

By establishing two injury dates in this carpal tunnel syndrome case, the Board was subverting the bright line rule set out in *Berry*. In *Berry*, the date of accident or date of occurrence in a workers compensation action involving carpal tunnel syndrome is the last day on which a claimant performs services for his or her employer and is required to stop working as a direct result of the claimant's pain and disability resulting from carpal tunnel syndrome. 20 Kan. App. 2d 220, Syl. ¶ 3. The Board's finding of two accidents or injuries in this carpal tunnel syndrome case is contrary to *Berry* and the court's discussion of how carpal tunnel is a hybrid condition not easily termed a "personal injury caused by accident" or an "occupational disease." 20 Kan. App. 2d at 227-29. The Fund argues that applying the *Berry* bright line rule in the case at bar

would set the date of accident or occurrence as happening in December 1992, and the Fund could be relieved of all liability.

However, the *Treaster* court softened the *Berry* rule in a manner which could have been relied upon by the Board in the instant case had *Treaster* been available. "One of the purposes of the Fund, sometimes referred to as the 'Second Injury Fund,' is to encourage the employment of persons handicapped as a result of specific impairments by relieving employers, wholly or partially, of worker's compensation liability resulting from compensable accidents suffered by these employees. K.S.A. 44-567(a)." *Wasson v. United Dominion Industries*, 266 Kan. 1012, 1019, 974 P.2d 578 (1999).

K.S.A. 1999 Supp. 44-567(a) provides:

"(a) An employer who operates within the provisions of the workers compensation act and who knowingly employs or retains a handicapped employee, as defined in K.S.A. 44-566 and amendments thereto shall be relieved of liability for compensation awarded or be entitled to an apportionment of the costs thereof as follows:

(1) Whenever a handicapped employee is injured or is disabled or dies as a result of an injury which occurs prior to July 1, 1994, and the administrative law judge awards compensation therefor and finds the injury, disability or the death resulting therefrom probably or most likely would not have occurred but for the preexisting physical or mental impairment of the handicapped employee, all compensation and benefits payable because of the injury, disability or death shall be paid from the workers compensation fund."

Thus, the issue is squarely presented: If Cozad's date of injury is in December 1992, Boeing did not retain a handicapped employee and is not entitled to any apportionment of the cost. If, however, the date of injury is May 1992, then Boeing did retain a handicapped employee and is entitled to an apportionment of the cost.

The Board's rationale for apportioning liability was that Boeing continued to employ Cozad in her disabled status. The rule in *Treaster* applied to the case at bar provides that employees do not need to reach the ultimate devastating breaking point of advanced carpal tunnel before the Fund will incur any liability. Interpretations of the Workers Compensation Act should reward employers who attempt to accommodate carpal tunnel victims before the breaking point. Here, Boeing accommodated Cozad within the

work restrictions set forth by Dr. Morris. Abuses of this rule to the advantage of the employer and the disadvantage of the Fund are possible, but unlikely, given that *Treaster* sets the following condition:

"Where an accommodated position is offered and accepted that is not substantially the same as the previous position the claimant occupied, the date of accident or occurrence in a repetitive use injury, a carpal tunnel syndrome, or a microtrauma case is the last day the claimant performed the earlier work tasks." 267 Kan. 610, Syl. ¶ 4.

In order for Boeing to be either completely relieved of liability or entitled to an apportionment of the award from the Fund, Boeing has the burden of showing: (1) it knowingly retained a handicapped employee as defined in K.S.A. 44-566(b), and (2) either (a) the injury probably or most likely would not have occurred "but for" the preexisting handicap or (b) the injury was contributed to by the preexisting handicap. K.S.A. 1998 Supp. 44-567(b).

Cozad was diagnosed in May 1992 by Dr. Morris and Dr. Blaty as suffering from bilateral carpal tunnel syndrome. There is really no argument as to notice or knowledge in this case because Boeing accommodated Cozad within the restrictions set forth by Dr. Morris. The *Treaster* test examines whether the accommodated position is substantially the same as the previous position occupied by the claimant. Cozad's previous position requiring an 8-hour day of riveting and drilling is clearly not substantially the same as a restricted employment of no riveting and a maximum of 4 hours a day drilling, with the remainder of the work day performing clerical work. Consequently, the date of the accident or injury was May 12, 1992, and Boeing knowingly employed a handicapped employee after that date.

We also find the evidence supports the Board's decision that Cozad's advanced carpal tunnel syndrome probably or most likely would not have occurred "but for" the preexisting carpal tunnel injuries. Both Dr. Blaty and Dr. Zimmerman opined that 50% of Cozad's disability existed in April/May or 1992 and that the remaining 50% of her disability occurred thereafter.

The Board's decision is affirmed, although its rationale is not adopted. See *Bergstrom v. Noah*, 266 Kan. 847, Syl. ¶ 7, 974 P.2d 531 (1999).

Affirmed.